## Case No. 6,349.

### Ex parte HENDERSON.[1]

Circuit Court, D. Kentucky. May 24, 1878.

COURTS-MARTIAL — JURISDICTION OVER CONTRACTORS FOR MILITARY SUPPLIES — CONSTITUTIONAL LAW — CONSTRUCTION OF STATUTES — HABEAS CORPUS.

[1. The act of March 2, 1863, "to prevent and punish frauds upon the government," and which declares that certain persons therein enumerated, including "contractors," agents, paymasters, etc., shall be subject to trial by court-martial for the frauds therein specified, is expressly limited to persons in the land or naval forces, or in the militia, in the actual service of the United States; and it gives no power to try by court-martial a mere contractor to furnish supplies to the government for the use of the military service.]

[2. The provision contained in the sixteenth section of the act of July 17, 1862, that "any person who shall contract to furnish supplies of any kind or description for the army or navy, shall be deemed and taken as a part of the land or naval forces of the United States for which he shall contract to furnish said supplies," is unconstitutional, in so far as it would operate to subject a contractor to trial by court-martial.]

[3. If not unconstitutional, the provision, by its terms, only makes contractors subject to trial by court-martial for fraud or willful neglect of duty in connection with their contracts, and not for offenses unconnected therewith.]

1 [Not previously reported.]

[4. The expressions "army and navy" and "land and naval forces" are used in this section, in their strictly constitutional and legal sense, and mean the regular army and navy, and do not include the militia; and hence a charge that defendant was engaged in furnishing supplies "for the military services" is indefinite, and states no offense, for it does not exclude the idea that he may have been engaged in furnishing supplies for the militia, in which case he would not come within the terms of the act.]

[5. In a trial by court-martial the charges cannot be so amended after arraignment as to entirely obliterate the original specifications and insert new ones describing wholly different offences; and hence, where the prisoner, pending his trial, seeks relief from a civil court by habeas corpus, and the charges are found wholly insufficient to show jurisdiction in the court-martial, a discharge will be granted.]

[This was a petition by Isham Henderson for a writ of habeas corpus.]

OPINION OF THE COURT. I have heretofore decided that the Rebellion against the authority of the United States was ended prior to the 23rd day of April, 1866, when the relator Henderson applied to me for a writ of habeas corpus, that consequently by the terms of Act March 3rd, 1863, the privileges of said writ are restored; that to a writ directed to a military officer it was not sufficient for him to return that he held the prisoner under orders of his superior, and was directed by him to obey no writ of habeas corpus, and that he might be compelled, in answer to a writ of habeas corpus, to return the body of any person detained by him even though he should certify under oath that such person was "detained by him as a prisoner under authority of the president of the United States." I also decided that the officer who refused to obey the writ by returning the body of the prisoner was guilty of a contempt of court and might be punished for the same; accordingly process of contempt was actually issued. I am not disposed to retract or modify anything formerly decided, nor anything contained in the opinion then pronounced. The opinion was not rendered until after the fullest consideration, and subsequent reflection has confirmed my conviction of the correctness of all the views then expressed. I find, too, that in every essential particular, they are directly sustained in an able opinion recently pronounced in the state of New York by Mr. Justice Nelson, of the supreme court of the United States, in Re Egan [Case No. 4,303]. I am now gratified to state that, after all the foregoing proceedings took place, General Thomas and General Davis have both appeared in court, and so far purged themselves of the actual or apparent contempt that even the counsel of the prisoner formally requested the court to proceed no further in the process issued in that behalf. General Thomas and General Davis not only declared that no contempt was intended, but the body of the prisoner has been produced in court by General Davis, and submitted fully to its jurisdiction and order. General Davis has also, by permission of the court, filed an amended return. And now the counsel of the prisoner, alleging that the return shows no sufficient cause for his arrest or detention, have moved that he be discharged. The motion made in this form assumes that all the facts legally stated in the return are true, but admitting their truth the prisoner is entitled to his discharge. The return says in substance that the relator was arrested under orders from Major General Thomas for the purpose of being brought to trial before a general court-martial then convened at Nashville, Tenn., upon certain charges and specifications which are made part of the return. It further states that he has been put upon his trial before said court on said charges and that the trial has not yet terminated, but was progressing until it was suspended, in order that the prisoner might be brought before the court in obedience to the writ of habeas corpus.

Jurisdiction of Courts-Martial. The return would perhaps have been more formal if, instead of simply referring to the charges, it had set them out at length. But the same strictness has never been applied to a return to a habeas corpus which is applied to pleadings in civil actions. Hurd, Hab. Corp. p. 259. As the return refers to, and makes part of, it the charges and specifications, I am of the opinion that these charges and specifications must be regarded by this court as part of the return as fully as if they were copied bodily into it. Courts-martial are lawful tribunals existing by the same authority that other courts exist. Their jurisdiction, it is true, is limited and special, being confined to military persons charged with military offenses, over such persons charged with offenses defined by law. Their jurisdiction is complete. They are indeed liable to the controlling authority which the civil courts have at all times exercised of preventing them from exceeding the jurisdiction given to them. Grant v. Gould, 2 H. Bl. 107; Wise v. Withers, 3 Cranch [7 U. S.] 336. They may by appropriate proceedings in the civil courts be prohibited from trying a civilian or carrying their sentence into execution, in any case not warranted by law. Pendergast's Law Pertaining to Officers in the Army, p. 202; Wolfe Tones, Case referred to, D, page 10. But in respect to persons subject to their authority, and charged with offenses subject to their jurisdiction, the civil courts do not sit as courts of error to review the regularity of their proceedings. Informality, therefore, in the proceedings of a court-martial cannot be remedied or inquired into by a civil court. The ground work of the jurisdiction and the extent of the powers of courts-martial are to be found in the rules and articles of war, and upon all questions arising on them the civil courts of the United States are competent to decide; but these articles do not alone constitute the military code. They are

for the most part silent on all that relates to the procedure of military tribunals to be organized under them. This procedure is founded upon the usages and customs of war, upon the regulations prescribed by the president under the authority of congress and upon old practice in the army, as to all which points common law judges have no opportunity, either from their law books or from the course of their experience, to inform themselves. It would therefore be most illogical, to say nothing of the impediments to military discipline, which would thereby be interposed, to apply to the procedure of courts-martial those rules which are applicable to another and different course of practice. See Lord Denman's opinion in Re Poe, 5 Barn. & Adol. 688. The questions then presented on this motion have no relation to the regularity or irregularity of the proceedings of the court-martial before which the relator has been arraigned. Those proceedings are in fact not before me, and if they were I disclaim all authority to review them. The questions which I have to consider are two, and two only—to wit: First. Do the charges show the relator to be a person who is subject to be tried by a court-martial? Second. Do the charges set forth an offense for which he can be tried by such court? Accordingly as these questions are answered in the affirmative or in the negative must the relator be remanded for trial before the court-martial or discharged from custody.

Looking now into the charges on which the relator has been arraigned before the court-martial, I find it is nowhere alleged that he is or has been an officer or soldier in the army, or that he has ever been in the land or naval forces or in the militia, or that he has ever even been a camp retainer, or that he has served with the armies in the field. It is simply recited that he was "late a contractor engaged in furnishing supplies for the United States government, for the use of the military service thereof," and it is charged that whilst he was such contractor, he committed several of the offenses denounced by the act of congress approved March 2, 1863. These charges and specifications are too long to be here reproduced, nor can their complete reproduction be necessary, since I do not propose to question their sufficiency in form. Suffice it to say, they do not charge the relator with "any fraud or willful neglect of duty" in respect to his alleged contract for supplies, or that whilst he had charge, possession, control or custody of any money or other public property used or to be used in the military or naval service of the United States "he did with intent to defraud the United States, or willfully conceal such money, or other property, deliver or cause to be delivered to any person having authority to receive the same or any amount of such money or other public property less than that for which he received a certificate or receipt" the charges on which he was arraigned

are wholly distinct from either of these. This cannot and will not be disputed, and has in fact been admitted throughout the argument of the case before me.

### Construction of Act of March 2, 1863.

The only act of congress referred to in the charges is that of March 2, 1863, and is entitled "An act to prevent and punish frauds upon the government of the United States." 12 Stat. 696. It provides:

"Section 1. That any person in the land or naval forces of the United States, or in the militia in actual service of the United States, in time of war, who shall make or cause to be made, or present or cause to be presented for payment or approval to or by any person or officer in the civil or military service of the United States, any claim upon or against the government of the United States, or any department or officer thereof, knowing such claim to be false, fraudulent, or fictitious; any person in such forces or service who shall for the purpose of obtaining or aiding in obtaining the approval or payment of such claim, make, use or cause to be made or used, any false bill, receipt, voucher, entry, roll, account, claim, statement, certificate, affidavit, or deposition, knowing the same to contain any false or fraudulent statement or entry; any person in said forces or service who shall make or procure to be made, or knowingly advise the making of any false oath, to any fact, statement or certificate, voucher or entry, for the purpose of obtaining or of aiding to obtain any approval or payment of any claim against the United States, or any department or officer thereof; any person in said forces or service who for the purpose of obtaining or enabling any other person to obtain from the government of the United States, or any department or officer thereof any payment or allowance, or the approval or signature of any person in the military, naval or civil service of the United States, of or to any false, fraudulent or fictitious claim, shall forge, or counterfeit, or cause or procure to be forged or counterfeited any signature upon any bill, receipt, voucher, account claim, roll, statement, affidavit, or deposition; and any person in said forces or service, who shall alter or use the same as true or genuine, knowing the same to have been forged or counterfeited; any person in said forces or service who shall enter into any agreement, combination, or conspiracy, to cheat or defraud the government of the United States, or any department or officer thereof, by obtaining or aiding and assisting to obtain, the payment or allowance of any false or fraudulent claim; any person in said forces or service, who shall steal, embezzle, or knowingly and willfully misappropriate or apply to his own use, or benefit, or who shall wrongfully and knowingly sell, convey, or dispose of any ordnance, arms, ammunition, clothing, subsistence, stores, money or other property of the United States furnished or to

be used for the military or naval service of the United States; any contractor, agent, paymaster, quartermaster, or other person whatsoever in said forces or service having charge, possession, custody, or control of any money or other public property, used, or to be used in the military or naval service of the United States, who shall with intent to defraud the United States, or willfully to conceal such money, or other property, deliver or cause to be delivered to any other person having the authority to receive the same or any amount of such money or other public property less than that for which he shall receive a certificate or receipt; any person in said forces or service who is or shall be authorized to make or deliver any certificate, voucher or receipt or any other paper certifying the receipt of arms, ammunition, provisions, clothing, or other public property so used or to be used, who shall make or deliver the same to any person without having full knowledge or truth of the facts stated therein and with intent to cheat, defraud or injure the United States; any person in said forces or service who shall knowingly purchase or receive, in pledge for any obligation or indebtedness from any soldier, officer, or other person called into or employed in said forces or service, any arms, equipments, ammunition, clothes, or military stores, or other public property, such soldier, officer or other person not having the lawful right to pledge or sell the same, shall be deemed guilty of a criminal offense, and shall be subject to the rules and regulations, made for the government of the military and naval forces of the United States, and of the militia when called into and employed in the actual service of the United States in time of war and to the provisions of this act. And every person so offending may be arrested and held for trial by a court-martial and if found guilty shall be punished by fine and imprisonment, or such other punishment as the court-martial may adjudge, save the punishment of death.

"Sec. 2. That any person heretofore called or hereafter to be called into or employed in such forces or service who shall commit any violation of this act and shall afterwards receive his discharge or be dismissed from the service shall notwithstanding such discharge or dismissal continue to be liable to be arrested and held for trial and sentence by a court-martial in the same manner and to the same extent, as if he had not received such discharge or been dismissed.

"Sec. 3. That any person not in the military or naval forces of the United States nor in the militia called into or actually employed in the service of the United States, who shall do or commit any of the acts prohibited by any of the foregoing provisions of this act he, shall forfeit and pay to the United States the sum of two thousand dollars and, in addition double the amount of damages which the United States may have sustained by reason of the doing or committing such act, together with the costs of suit; and such forfeiture and damages shall be sued for in the same suit, and every such person shall, in addition thereto, on conviction in any court of competent jurisdiction, be punished by imprisonment not less than one, nor more than five years or by fine of not less than one thousand dollars and not more than five thousand dollars."

It is manifest, looking to this act alone, that the only offense for which it professes to subject a contractor to trial by a court-martial is the single one of delivering or causing to be delivered to some person having authority to receive the same, an amount of money or other public property of which he has charge, possession, custody, or control, less than that for which he shall receive a certificate or receipt with intent to defraud the United States or willfully conceal such money or property. I am inclined to think that by the term "contractor" here used is not meant the person who contracts to furnish the government, subsistence, clothing, or other supplies for its army or navy, but some person who has in charge, possession, or control such supplies after they have been furnished. The contractor contemplated by the statute is evidently one who has in his "charge, possession, custody, or control" money or property, which actually belongs to the United States, and not such as has been contracted to be delivered and which does not become the property of the United States until delivered. The only person known to me, connected with the army of the United States, who at all answers to the description of a contractor is the "military storekeeper," mentioned in the thirty-sixth article of war, in the eighth section of Act July 5, 1862 (12 Stat. 509), in the first section of Act May 20, 1862 (12 Stat. 403), and in the sixteenth section of Act July 17, 1862 (12 Stat. 600). These "military storekeepers" are required by law to give bond and security for the faithful performance of their duties. They are therefore in a certain sense contractors, and precisely such contractors as have charge of the property of the United States in the sense contemplated by the above noted provisions of the act of March 2nd, 1863. No other contractor known to the law has such charge. Certainly a contractor for supplies has no such charge. Moreover a "military storekeeper" is a regularly commissioned officer or member of the army. There is no difficulty in subjecting him to a trial by a court-martial; but there is certainly great difficulty, if not an unsurmountable constitutional obstacle to the subjecting of civil contractors for supplies for the army to such jurisdiction. Surely, that construction of the act which makes all of its provisions intelligible and harmonious with the constitution should be adopted rather than one which is unmeaning, and, to say the least, of doubtful constitutionality. Assuming this construction of the act of March 2, 1863, to be correct,—and I think it is,—there is no per-

son who is not literally and really in the land or naval forces, or in the militia in service, that under the provisions of the first section can be tried by a court-martial; all other persons—that is, all that are not in the land or naval service or in the militia when in service—are by the terms of the third section to be tried by a civil court. This construction is fortified by the provisions of the second section, for surely the terms "discharged from service," "dismissed from service" apply to those persons only who are in the service in such sense that they can be discharged or dismissed therefrom. These are technical terms frequently used in our laws and regulations relating to the army and navy, and their signification is well understood. They are evidently used in this section in their well known and common meaning. They have no application to an ordinary contractor for supplies. He is not in the service to be discharged and dismissed. He receives no discharge or dismissal. If he performs his contract, or it is rescinded, he is absolved from his obligation, but I repeat he is not in any correct sense "dismissed" or "discharged" "from service."

It is unnecessary to pursue the discussion of this branch of the subject further, for it is conceded and undeniable that unless the relator was in the land forces (being in the military service might not suffice) at the time he committed the alleged offenses, he is not subject to be tried by a court-martial upon the charges on which he has been arraigned. What I have said respecting the construction of the act of March 2, 1863, has been said chiefly to show that congress have not by that act conferred on courts-martial that enlarged jurisdiction over ordinary contractors which military men have I understand, supposed, and what has been said on this subject will not have been said in vain if it shall enable us to approach with a better understanding the consideration of other acts of congress to which reference will now be made.

### Construction of the Act of July 17, 1862.

The act of March 2, 1863, as we have seen, subjects "any person in the land or naval forces of the United States" to trial by court-martial for various offenses. It is not pretended that it is anywhere alleged in the charges on which the relator was arraigned that he was or ever had been in either the land or naval forces, but it is insisted that the charge that he was "late a contractor engaged in furnishing supplies to the United States government for the use of the military service thereof," is equivalent to, and in legal effect the same as, a direct charge that he was lately in the land force of the United States. The proposition that these charges are identical certainly shocks the common understanding. To contend that the assertion that one is a "contractor engaged in furnishing supplies to the United States government for the military service there-

of" is the same as the assertion that he is a "soldier," or that he is "in the land forces," is to maintain a most startling proposition; and yet this precise proposition must be maintained in order to furnish any pretense of jurisdiction to the court-martial over the relator. Startling as the proposition is, it is insisted that it is fully supported by the provisions of the sixteenth section of the act of July 17, 1862, entitled "An act to define the pay and emoluments of certain officers of the army, and for other purposes." 12 Stat. 594. This section reads as follows: "That whenever any contractor for subsistence, clôthing, arms, ammunition munitions of war, and for every description of supplies for the army or navy of the United States shall be found guilty by a court-martial of fraud or willful neglect of duty, he shall be punished by fine, imprisonment, or such other punishment as the court-martial shall adjudge; and any person who shall contract to furnish supplies of any kind or description for the army or navy, shall be deemed and taken as a part of the land or naval forces of the United States for which he shall contract to furnish said supplies, and be subject to the rules and regulations for the government of the land and naval forces of the United States." This provision does indeed, if it is constitutional, subject a contractor for supplies for the army or navy of the United States to trial by a court-martial for fraud or willful neglect of duty. But I am of the opinion that according to its true construction the provision does not attempt to subject a contractor to a trial by a court-martial for any fraud or neglect of duty except a fraud or neglect of duty in respect to his contract for supplies, for any fraud or neglect of duty committed by him in his private relations as a citizen the government can have no interest in calling him to an account before its military courts, even if it had power to do so; and when the government declares that if he be found guilty by a court-martial of fraud or neglect of duty he shall be punished, it must, by necessary and unavoidable intendment, be understood to mean a fraud or neglect of duty which it has motive to so punish. A contractor for supplies owes no duty to the government except such as grows out of his contract, which is not common to every private citizen; neither can he commit any fraud on the government except in connection with his contract with the government, which may not be committed by any one; and I see no more propriety in subjecting him to trial by a court-martial for such frauds and neglect of duty as have no connection with his contract, than there is for trying any private citizen before that court for like delinquencies. That this would be a correct construction of the statute if it had proceeded no further than to provide that the contractor might be tried by a court-martial

for fraud or neglect of duty cannot, I think, admit of a doubt. Such construction satisfies all that the language of the statute requires, and harmonizes with its policy and purpose. But if it had stopped here, doubt might have existed as to the proper mode of organizing the court-martial provided for, whether it should be organized in the manner required by the rules and articles of war "or according to the general usage of the military service, or what may not unfitly be called the 'customary military law,'" are questions which military men might have found difficulty in solving. A similar question arose respecting the construction of a similar provision contained in the fifth section of the act of February 28, 1795 (1 Stat. 424). And it was answered by the supreme court in the case of Martin v. Mott, 12 Wheat. [25 U. S.] 35, that such a court-martial was not required to be organized as provided in the rules and articles of war, but might be called and formed according to the customary military law. It was to remove this doubt, or rather that there might be an explicit provision respecting the manner of organizing the court-martial, and not that its jurisdiction over the contractor should be enlarged beyond what had already been given, that the statute proceeds to declare that he shall be deemed and taken as a part of the land or naval forces. It does not declare that he is or shall be a part of the land or naval forces, but deemed and taken as a part of them; that is, deemed and taken as a part of them for all purposes of organizing the court-martial and trying him by it for fraud or willful neglect of duty in respect to his contract. That this is the proper construction of the section without reference to the provisions of any other statute is, to my mind, obvious enough, but its correctness is made doubly sure and clear if we turn to the rules and articles of war themselves, to which, it is said, this section makes the contractor subject. An attentive examination of them will satisfy any one that there is not a single provision in them, excepting the provisions relating to the organization of courts-martial, which can by any, even the most constrained, construction be applied to a contractor for supplies; and this exception is not by virtue of the rules and articles of war themselves, but by virtue of the act of 1862, which we have been considering. The contractor is not an officer nor a soldier; but it is against them, and them only, that the articles of war denounce penalties, if we except only a few provisions respecting "sutlers, retainers to the camp, and persons serving with the armies in the field," and one provision respecting spies. If he were arrested and charged with a violation of the ninety-ninth article of war, which applies to him if any does, he could reply, "I am neither an officer nor a soldier, and it is only disorders and neglects which officers and soldiers may be

guilty of to the prejudice of good order and military discipline which are denounced and punishable by that article," and a like or similar reply could be made by him to any charge founded on any other article of war; it being thus manifest, notwithstanding the declaration of the sixteenth section of the act of 1862, that the contractor shall be deemed or taken as a part of the land or naval forces and subject to the rules and regulations (articles) for the government of the land and naval forces; that none of the rules and articles of war are in fact applicable to his punishment and none to his trial except those which relate to the organization of a court-martial. I consider it satisfactorily demonstrated that the only effect of these declarations is to require that the court-martial for the trial of a contractor for fraud or willful neglect of duty in respect to his contract shall be organized as provided in the articles of war. Their effect is not to make him in fact a part of the land or naval forces, but only that he is to be taken as part of the one or the other of these forces, accordingly as the contract relates to one or the other when steps are taken to organize a court-martial and to try him for the specific offense denounced by the statute. I am the more inclined to adopt this conclusion because, though even if it extends the power of congress to the utmost verge of their constitutional authority, there is some plausibility in extending it thus far. The efficiency of military operations depends so much upon the army being promptly and properly furnished with supplies, that there seems to be some propriety in so far subjecting contractors for supplies to military jurisdiction as to punish them for delinquencies in respect to their contracts. But to extend the power of congress one step further, to stretch it over contractors so far as to subject them to trial by court-martial for acts not growing out of their contracts and not affecting military operations more than similar acts performed by any private citizen would affect them, is to stretch it beyond any limit ever assigned by any one who admits that there is any restriction whatever on the constitutional powers of congress. And it is not to be assumed, unless the language of the act imperatively demands it, that congress claim any such extensive and arbitrary authority. It follows from this view that whenever in the act of March 2, 1863, or in any other act of congress, penalties are denounced against "any person in the land or naval forces of the United States or in the militia in actual service of the United States in time of war," contractors cannot be held to be included unless specially named. And it also follows that as the relator stands charged before the court-martial with no offense under the act of July 17, 1862, as all the charges are framed under the act of March 2, 1863, for offenses not denounced against him but

specially against persons in the land or naval forces or in the militia, the court-martial is without jurisdiction to try him on the charges now preferred.

Another construction of the act of July 17, 1862. There is still another view to be taken of the construction of the act of July 17, 1862, with respect to the charges against the relator, to which I will briefly advert. I have already said that in all the "charges and specifications" the relator is described as "late a contractor engaged in furnishing supplies to the United States government for the use of military service thereof." It is not otherwise stated to what branch of the service the relator belonged. More particularity in this respect was demanded, because if he belonged to the naval forces or the militia he could not be tried by a court-martial composed of officers in the land forces or regular army, and if he belonged to the "land forces" or to the militia he could not be tried by navy officers. Now if it can be successfully maintained—which I think more than doubtful—that the term "military service" ex vi termini excludes naval service, it surely cannot be asserted that it excludes service by the militia. If the militia in the actual service of the United States are as much a part of the military service as the land forces, strictly so called, then, it being alleged in the charges simply that the relator was a contractor engaged in furnishing supplies "for the use of the military service of the United States," there is nothing in them to show whether the supplies were for the "militia" or the "land forces" or "army," and consequently nothing to show to which branch of the service the relator belonged, even if it be conceded that his being a contractor to furnish supplies made him a part of that branch of the service which he contracted to supply. There is nothing in the charges or in the return to show whether the court-martial is composed of officers of the land forces or regular army, or of the militia, and consequently it does not appear whether the court has been legally organized or not. As however the illegal organization of the court would not render the arrest of the relator illegal, if he were arrested upon legal charges, but might result only in the dissolution of the present court and the organization of another, the above objection might not, in the form in which it has been presented, result in the discharge of the prisoner; but we have to construe the sixteenth section of the act of July 17, 1862, with much less strictness than is usually applied to penal statutes, to discover that it is only the contractor for furnishing supplies to the regular army or navy, and not the contractor who engages to supply the "militia," that is made a part of the "land" and "naval" forces, and subject to trial by a court-martial for fraud or willful neglect of duty. Unquestionably, in a certain and general sense the terms "army," "land forces," do embrace militia in actual

service. The militia do serve on land, and therefore, in the popular sense, are a part of the land forces; but in the contemplation of the constitution and laws of the United States the militia, though in service, and the army or land forces, are quite distinct. This will be made entirely apparent by reference to some of the provisions of the constitution and the acts of congress. In the eighth section of the first article of the constitution it is among other things declared that "the congress shall have power (13) to raise and support armies; (14) to provide and maintain a navy; (15) to make rules for the government and regulation of the land and naval forces; (16) to provide for calling forth the militia to execute the laws of the Union, suppress insurrection and repel invasions; (17) to provide for organizing, arming and disciplining the militia and for governing such part of them as may be employed in the service of the United States, reserving to the states respectively the appointment of the officers and the authority of training the militia according to the discipline prescribed by congress." If the militia employed in the service of the United States were in the constitutional sense a part of the "land forces," there could have been no necessity or propriety, after prescribing that congress should have power to provide for the government of the land forces, to provide also by a separate clause that they should have power to provide for governing such part of the militia as might be employed in service. If the former clause invested congress with authority for governing the militia in service there would certainly be no necessity for a distinct clause investing them with this specific authority. We have no right to dispense with either clause. We have no right to say that either is unnecessary. They both stand in the constitution, and thus standing there they do demonstrate beyond cavil that in the understanding of the framers of the constitution "land forces" and "militia in service" are distinct bodies. This is made still more apparent by the fifth article of the amendments to the constitution. That article provides that "no person shall be held to answer for a capital or otherwise infamous crime unless on a presentment or indictment of a grand jury, except in cases arising in the land and naval forces or in the militia when in actual service in time of war or public danger."

The framers of the constitution thought it was not sufficient to provide that no person, except in cases arising in the land or naval forces, should be held to answer for a capital or other infamous crime unless on a presentment or indictment, but recognizing the militia in service as distinct from the land forces, they have also by a separate provision, excepted cases arising in the militia when in actual service in time of war or public danger. We thus see that whenever in the constitution the term "land forces" is used, it

means the regular army of the United States, and does not include the militia in service. The same thing will be seen when we turn to the various acts of congress relating to the armies and to the militia. These acts are too numerous for me to refer to all of them; I will therefore advert to only a few. By the act of April 10, 1806 (2 Stat. 359), it is provided "that the following shall be the rules and articles by which the armies of the United States shall be governed." By "armies" is meant the regular armies or land forces, and not the militia in service, so the supreme court thought (Martin v. Mott, 12 Wheat. [25 U. S.] 35), and so I think, and hence it is expressly provided by the ninety-seventh article of war that the militia being mustered and in pay of the United States,—that is, in actual service,—when joined or acting in conjunction with the regular forces of the United States shall be governed by the rules and articles of war. There could be no necessity for this provision if the militia when in service were ipso facto a part of the army of the United States. Besides this article, other acts of congress provide that courts-martial for the trial of militia men in military service shall be composed entirely of militia officers, whereas officers and soldiers belonging to the armies or land forces may be tried, if they are required to be tried, by courts-martial composed entirely of officers of the regular army. The same distinction is recognized in the fourth, fifth, and sixth sections of the act of 28th of February, 1795, which act authorizes the president to call forth the militia to enforce the laws of the Union to repel invasion and to suppress insurrections. So also in the first section of the act of 3d March, 1807 (2 Stat. 443), it is provided "that in all cases of insurrection, or obstruction to the laws, * * * when it is lawful for the president of the United States to call forth the militia for the purpose of suppressing such insurrection, or of causing the laws to be duly executed, it shall be lawful for him to employ, for the same purposes, such part of the land or naval force of the United States, as shall be judged necessary." Surely it cannot be said that the term "land forces" is here used synonymously with "militia in service," and indeed the distinction is nowhere more manifest than in the very act under which the relator was arraigned, to wit, the act of 2d March, 1863 (12 Stat.) 696. Its first section provides "that any person in the land or naval forces of the United States, or in the militia in actual service of the United States in time of war, who shall," &c. Congress could not have more explicitly declared that in their understanding the land and naval forces do not include the militia in service, and this understanding is manifested throughout the numerous clauses of this section, and in fact throughout the various sections of the act. I consider it is now demonstrated so as to be apprehended by the commonest understanding that when

the act of July 17, 1862, declares that "any person who shall contract to furnish supplies * * * for the army or navy he shall be deemed and taken as part of the land or naval forces" it must be understood to use the terms "army or navy," "land or naval forces," in their strict constitutional sense, and in the sense in which they are used in other acts of congress, and that in this sense, these terms do not embrace the militia in service. The act then, interpreted as I have shown it must be, means that any persons who shall contract to furnish supplies for the army—not the militia in service—shall be deemed and taken as part of the "land forces," and any person who shall contract to furnish supplies for the navy shall be deemed and taken as part of the naval forces, and as I have in the first part of this opinion shown, only so far a part of those forces as it respects the organization of a court-martial and the trial of the contractor for fraud or willful neglect of duty in connection with his contract.

The conclusion from all this discussion is that as the charges on which the relator was arraigned claim only that he was a contractor engaged in furnishing supplies for the use of the military service of the United States, not the army, they are not sufficiently specific, and show no jurisdiction in the court-martial to try him, even if that court otherwise had jurisdiction to try him for any of the offenses set forth in the charges. The act of congress does not confer nor attempt to confer any jurisdiction on a court-martial to try a contractor, unless he be a contractor for supplies for the army or navy, understanding these terms in their constitutional and legal sense as embracing only the regular army or naval forces and not the militia in service. I do not decide, nor have I even considered, the question whether the "volunteer" forces of the United States were a part of the regular army or of the militia in service. In the Mexican War, as well as in the War of the Rebellion, they were treated by the government as militia, and I should be reluctant to hold that this practice of the government is unfounded in law.

But it has been insisted that, although the court-martial before which the relator has been arraigned has no jurisdiction to try him on the present charges, those charges may be amended and so describe the offense and the prisoner as to bring him within the terms of the act of the 17th of July, 1862, as here interpreted, and that, therefore, the foregoing conclusions do not show that the arrest of the prisoner was illegal. I admit that military usage may justify amendment of charges in some respects after the arraignment of the prisoner, but I imagine that "no authority can be found for so amending charges, after arraignment as to entirely obliterate the original specifications and insert new ones, describing or setting forth offenses wholly different from those originally described," and this

I have shown the court-martial would be obliged to do in order to bring the prisoner within even the terms of the act of congress. Moreover, it was not lawful under the articles of war to arrest the prisoner except upon legal charges, and, it being shown that the charges are illegal, it follows that his arrest as well as trial by the court-martial is illegal. Admitting, however, that if the prisoner was a contractor for furnishing supplies for the army of the United States, and that he is, by the terms of the act above mentioned, subject to be tried by a court-martial for frauds or willful neglect of duty in respect to his contract, and admitting further, that whilst he was in custody of the court-martial he might have been retained until these charges were preferred, it does not follow that he can now be remanded to its custody, when it is not shown that he is in fact amenable to any such charges. It is nowhere alleged in the return nor elsewhere shown or averred that the relator is guilty of any offense. It is simply stated that he is charged with certain crimes, and is on trial for them before a court-martial, and it being shown that the court-martial has no jurisdiction to try him for these offenses it follows there is no pretense for longer holding him in custody.

### Constitutionality of the Act of 17th July, 1862, Considered.

If, however, this conclusion could be resisted, if it could be shown to be proper to remand the prisoner in order to give the court-martial an opportunity to proceed against him for some supposed fraud or willful neglect of duty as a contractor for supplies for the army, still this could be proper only upon the assumption that the sixteenth section of the act of the 17th of July, 1862, which defines the supposed offenses, is constitutional, and, my opinion on this subject being free from all admixture of doubt, I have no disposition to disguise it or evade its expression. My opinion, then, is that the sixteenth section above mentioned is clearly unconstitutional, and consequently void. And I would have contented myself with stating this opinion, and setting forth my reasons in support of it, without considering the construction of the statute at all, if the learned counsel had not confined their attention wholly to the construction of the statute without making any distinct constitutional question whatever. The constitution of the United States in the third subdivision of section 2 article 3 of the original text provides that "the trial of all crimes except in cases of impeachment shall be by jury; and such trial shall be held in the state where the said crimes shall have been committed, but when not committed within any state the trial shall be at such place or places as the congress may by law have directed." The difficulty is in finding, in spite of this provision, any authority in congress to provide for the trial of even persons in the army or navy, or in the militia in service, for crime, otherwise than by jury. We have, however, already seen that congress is empowered not only to "raise and support armies," "to provide and maintain a navy," but "to make rules for the government of the land and naval forces," and not only "to provide for calling forth the militia," but "for governing such part of them as may be employed in the service of the United States." Under these powers it has always been supposed that congress may provide for the trial by court-martial of persons in the land or naval forces or in the militia in service for military offenses. This is the usual mode of trial for these offenses which had prevailed in England, the country from which we borrowed most of our laws, for more than one hundred years prior to the adoption of our constitution, and in fact ever since England has had any standing army at all. It is also the mode which prevailed in the colonies at the time the convention sat, and it has been a part of our code of laws relating to the government of the land and naval forces and of the militia in service ever since we had a government. This mode of trial of military men for military offenses has become too well fixed in our system to now admit of question, nor do I mean to intimate that it would admit of serious question if we were now for the first time engaged in legislating on the subject. Experience has shown when once armies were raised it was so essential to govern them by providing for the punishment of breaches of discipline by military courts in order as well to protect the peace of society as to secure military efficiency, that I think there can be no doubt it was intended by the clauses of the constitution above mentioned to confer on congress the power to govern the land and naval forces and the militia in service in the way they had been usually governed; that is, by punishing military offenses in military courts. That this is the meaning and the limit of authority conferred by these clauses will be still more manifest when we look into the debates in the conventions of the several states which ratified the constitution, and to the amendments to the constitution proposed by the first congress. It has been seen that the original constitution provides only that "the trial of all crimes except in cases of impeachment should be by jury, and that such trial should be held in the state where the crime was committed." There was nothing requiring an indictment by a grand jury, nothing exempting the accused from being compelled to be a witness against himself, and nothing guaranteeing to him the right to be confronted with the witnesses against him or the assistance of counsel for his defense; and there was, moreover, nothing whatever requiring even a trial by a jury in ordinary civil suits. These were serious defects in the constitution, and they were well-nigh defeating its ratification altogether. It probably would have been defeated if it had not con-

fidently been expected that the constitution would be promptly amended after ratification. In the conventions in some of the states amendments relating to the precise matter now before us were actually suggested and agreed to. In Massachusetts the proposed amendments assumed this form, to wit: "That no person shall be tried for any crime by which he may incur an infamous punishment, or loss of life until he is first indicted by a grand jury except in such cases as may arise in the government and regulation of the land forces." In Virginia it was in this form: "That in all criminal and capital prosecutions a man hath a right to * * * a fair and speedy trial by an impartial jury of his vicinage, without whose unanimous consent he cannot be found guilty" (except in the government of the land and naval forces). In New York it was in this form: "That (except in the government of the land and naval forces, and of the militia when in active service, and in case of impeachment) a presentment or indictment by a grand jury ought to be observed as a necessary preliminary to the trial of all crimes recognizable by the judiciary," &c. We thus see that in the contemplation of these conventions, congress have or should have no power to provide for the trial of any person for crime otherwise than by jury except in the government of land or naval forces or the militia when in actual service. When Mr. Madison came to propose the amendment in the first congress, the proposition assumed this form: "The trial of all crimes except in cases of impeachment and cases arising in the land or naval forces or the militia when in actual service in time of war or great public danger, shall be by an impartial jury," &c. The actual form of the amendment, as it was finally proposed by congress, and ratified by the states, is as follows: "No person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury, except in cases arising in the land or naval forces or in the militia when in actual service in time of war or public danger," &c. Art. 5, Amend. Why the words "except in cases arising in the land and naval forces" were used instead of the words "except for the government of the land and naval forces," which had been, as we have seen, employed in the proposals of the state conventions, does not appear. But it is quite apparent that both forms of expression mean substantially the same thing. This article contains no grant of power to congress. The provision above quoted and all the provisions of the article are limitations upon some power which had been or was supposed to be conferred on congress by some other provisions of the constitution. But we have already seen that no power was in fact conferred on congress to provide for the trial of any person for a crime otherwise than by jury, except in the exercise of their power to make rules and regulations for the government of the land and naval forces, and of the militia in the service of the United States. Congress, doubtless, might under their power "to provide for the calling forth the militia" subject militia men, who refused to obey their call (this not being a crime in the sense of the constitution), to a small pecuniary penalty by the judgment of a court-martial. This was done by the fifth section of the act of 1795, and was recognized as proper by the supreme court. Houston v. Moore, 5 Wheat. [18 U. S.] 1; Martin v. Mott, 12 Wheat. [25 U. S.] 19. But congress have no power and never had to subject a militia man not in the military or naval service of the United States, much less a private citizen, to a trial by a court-martial for any crime, especially one that is capital or infamous. This is plain enough upon the face of the constitution, and it is supported by the opinion of Judge Story. Houston v. Moore, 5 Wheat. [18 U. S.] 62. He says substantially that to prevent, therefore, a manifest breach of the constitution, we cannot suppose that congress meant in the fourth section of the act of 1795 to provide that the militia who were called into service, but who refused to obey, should be subject to the rules and articles of war, but only that the militia in actual employment should be subject to them. As, then, the power of congress is limited to making rules and regulations for the government of the land and naval forces and of the militia in service, it would seem to follow that these regulations cannot extend beyond what is necessary and proper for the governing of these forces as such and in their military character. It is doubtful whether they can be subjected to trial by court-martial for anything except breaches of military duty. Every soldier may be or is a citizen, and it would seem is as much entitled to trial by jury for any alleged crime, not committed by him in violation of his duty as a soldier, as any other person. It would be difficult to maintain that a law which subjected him to trial by a court-martial for such an offense could be properly derived from the authority to provide for governing the land forces, or would have any constitutional sanction. I find indeed that no law subjecting a soldier to such a trial for such an offense committed in time of peace has ever been enacted in either England or America unless the act we are now considering be an exception. The mutiny act of England and our articles of war are confined to the defining and the providing for the punishment of military offenses. The purposes of these acts are so clearly and so accurately stated by Lord Laughborough in the case of Grant v. Gould, 2 H. Bl. 99, that I cannot forbear quoting from his opinion. "The army being established by the authority of the legislature, it is an indispensable requisite of that establishment that there should be order and discipline kept up in it, and that the persons who compose the army for all offenses in their

military capacity should be subjected to a trial by their officers. That has induced the absolute necessity of a mutiny act accompanying the army. * * * It is one object of that act to provide for the army; but there is a much greater cause for the existence of a mutiny act, and that is the preservation of the peace and safety of the kingdom; for there is nothing so dangerous to the safety of the civil establishment of a state as a licentious and undisciplined army; and every country which has a standing army in it is guarded by a mutiny act. An undisciplined soldiery are apt to be too many for the civil power, but under the command of officers answerable to the civil power they are kept in good order and dicipline. The object of the mutiny act therefore is to create a court invested with authority to try those who are in the army, in all their different description of officers and soldiers, and the object of the trial is limited to breaches of military duty. Even by that extensive power granted by the legislature to his majesty to make articles of war, those articles are to be for the better government of his forces, and can extend no further than they are thought necessary to the regularity and due discipline of the army." When war is actually raging it is said that a mutineer or deserter might unquestionably be tried by a military tribunal, according to the customary law of war (Pendergast, p. 3), and perhaps at that time other offenses committed by any one in the camp and in the field may be punished under the same law by the commander; but the common law of England knew nothing of courts-martial, and made no distinction in time of peace between a soldier and any other subject. A soldier, therefore, by knocking down his colonel incurred only the ordinary penalties of assault and battery, and by refusing to obey orders, by sleeping on guard, or by deserting his colors incurred no penalty at all. 1 Macaulay, History of England, p. 276; Pendergast, 15. The English people, with their omnipotent parliament, have ever been exceedingly jealous of granting to courts-martial any jurisdiction over persons except those actually in their army or navy, and over them they have granted jurisdiction to punish only military offenses,—such jurisdiction only as seemed essential for their government as soldiers or sailors. They have never, so far as I can find, attempted to subject contracts for supplies to such jurisdiction, nor indeed any person except officers, soldiers, and sailors and sutlers and camp retainers serving with the armies in the field. Such jurisdiction over contractors has, I know, been conferred by some of the arbitrary governments of Europe, but it has never found any place in English legislation, and it would be an anomaly in the institutions of a free people.

The Case of Tone is memorable in English history—memorable not only for the extraordinary proceedings which took place, but for the denial by the court of king's bench of the jurisdiction of courts-martial to try civilians, even though they were traitors. The cases of Smith v. Gore and ——— v. Governor Sabine are hardly less notable for a denial, in the former, of the jurisdiction of courts-martial to try even sutlers for an offense not committed "in the field," and, in the latter, of their jurisdiction to try a carpenter in the train of artillery. Pendergast's Law Relating to Officers of the Army, pp. 10, 11, 149, 150; 1 Cowp. 75. I am at a loss to conceive what relation the trial of a contractor by court-martial for fraud or breach of duty in respect to his contract has to the governing of the land or naval forces, or his prompt and proper compliance with his contract. No doubt the efficiency of military operations greatly depends, but so do the efficiency of these operations greatly depend, on the prompt payment of taxes by private citizens, and on the filling up of the thinned ranks by volunteering or draft. Government can not clothe or feed its soldiers without money; soldiers cannot live, much less fight, without clothing and food; the ranks of armies thinned off by battle or disease must be filled. I cannot therefore conceive of any argument which can be employed to uphold the power of congress to subject contractors to trial by court-martial which may not be employed with equal force to sustain their authority to subject any private citizen to trial by that court for failing or refusing to pay his taxes, or for discouraging volunteering, or for obstructing an enrollment or draft; nay, more, infinitely stronger reasons can be given for subjecting such private citizens to such a jurisdiction for these offenses than can be assigned for so subjecting a contractor for offenses not growing out of his contract, and which have little or no relation to military operations. If the power of congress is thus extensive, it certainly transcends every limit heretofore taught or imagined. Then have congress power to convert the government into a military despotism, and to subject every man in the land to trial by military tribunals. I am not willing to concede any such power. and whilst I am willing to concede to the government vast powers in war,—powers which are indeed extensive over the citizen and almost illimitable when directed against the enemy,—I cannot admit that its powers over the citizen are unbounded. "I cannot admit that, by its mere declaration, it can place every citizen in the country in the land and naval forces, and thus subject him to trial by court-martial for all the delinquencies of life." "Congress may, no doubt, under their power to raise armies, declare who shall be soldiers, —that is, what citizens shall be liable to perform military duty,—but they cannot by mere enactment, place a man in the army who is not. If they could, then they might by a simple declaration place every person in the United States in the army, no matter what his pursuits actually continued to be, and subject him to trial by court-martial,—a proposition so monstrous that no one, I imagine, will be

found so hardy as to maintain it. The declaration of congress in the sixteenth section of the act of July 17, 1862, that "any person who shall contract to furnish supplies of any kind or description for the army or navy shall be deemed and taken as a part of the land or naval forces" is then, in my opinion, simply idle and nugatory. It no more places him in the land or naval forces than he would be without such declaration. If he is not in the forces by virtue of his contract, and without such a declaration, then he is not in them at all; for as we have seen, no simple congressional declaration can possibly alter his status. But it may be said that, as congress may provide how enlistments for the army may be made, they may also provide that every person who voluntarily contracts to furnish supplies, or who does any other act, shall be deemed to have enlisted, and shall be subject to perform military duty. Possibly congress could do this. I will not say they could not. But I must say that such a provision would be most extraordinary, if not absurd, and that no such ridiculous provision is contained in the act on which we have been commenting. Nothing is plainer than that congress did not mean to convert the contractor into an enlisted soldier, subject to perform military duty. They leave him still a contractor, liable to perform no duty which is not stipulated in his contract, and only attempt by a simple declaration to place him in the army so as to subject him to trial by court-martial for delinquencies in respect to his contracts. I have already said, and I repeat, that such a declaration is unconstitutional as well as nugatory.

The conclusions to which I have now arrived are these:

1. That the 16th section of the act of July 17th, 1862, is unconstitutional, but, if it is not unconstitutional,

2. That it only makes contractors for supplies liable to be tried by a court-martial for fraud or willful neglect of duty, in connection with their contract.

3. That the relator is not charged with any such offense.

4. That the terms "army or navy," "land and naval forces," employed in the act, are used in their strictly constitutional and legal sense, and mean the regular army or navy, and do not include the militia.

5. That the relator is by the terms of the act made part of the regular army, and not of the militia, and is liable only in respect to a contract for supplying the regular army.

6. That he is not charged with supplying the army, but the military service; that the militia are a part of the military service as well as the army; and that consequently no offense is charged.

7. That the words, "any person in the land or naval forces of the United States or in the militia," &c., used in the act of March 2, 1863, do not include contractors, but military

or naval officers, soldiers, and sailors, and persons in the army or navy only.

8. That the court-martial is, on each and all of these grounds, without jurisdiction, and that therefore the relator must be discharged.

I have not, I confess, reluctantly arrived at this conclusion, because, if the relator is really guilty (which I repeat is neither shown nor alleged in these proceedings) of the offenses with which he is charged, he may, by the express terms of the third section of the act of the 2d of March, 1863, be tried and punished therefor by a civil court. If others may assert, I cannot, that in the civil court justice will not be done between the government and the accused. If others may assert, I cannot, that courts-martial are by their organization and mode of proceeding better fitted to administer enlightened justice than civil courts, presided over by judges learned in the law, aided by impartial juries; and if any one assert that the law is more promptly vindicated in courts-martial than in civil courts, let him also be sure that it is not more abused, and let him not attempt to verify his assertion by referring to the case of the accused who was not even arraigned for trial until nearly two years after the alleged commission of the supposed offenses, and whose trial, after being protracted more than thirty days, was only then suspended that he might be brought before this court.

Few persons, I think, appreciate more highly than I the great services rendered by the military during our late terrible national struggle. Few persons, I imagine, could be found more disposed than I to accord to the government whilst the war was flagrant transcendent powers. But now, that peace has returned, no one can be more fully persuaded than I that we have no hope of preserving our institutions or our liberties except by returning to the ancient channels for the administration of justice. I agree with Sir James McIntosh, that "while the laws are silenced by the noise of arms, the rulers of the armed force must punish as equitably as they can those crimes which threaten their own safety and that of society, but no longer. Every moment beyond is usurpation. As soon as the laws can act, every other mode of punishing supposed crimes is itself an enormous crime." Let the relator be discharged.

A true copy from the minutes of the court. Witness my hand and the seal of the circuit court this 24th day of May, 1878.

Saml. B. Crail, Clerk.

HENDERSON (BAILEY v.). See Case No. 737.

HENDERSON (BANK OF ALEXANDRIA v.). See Case No. 848.

HENDERSON (BEVERLY v.). See Case No. 1,378.

HENDERSON (BOWIE v.). See Case No. 1,730.