**DURANT v. HIATT, Warden.**

No. 2289.

United States District Court
N. D. Georgia, Atlanta Division.

Dec. 10, 1948.

Bruce F. Woodruff, of Woodruff & Etheridge, all of Atlanta, Ga., and Hugh

H. Obear, of Douglas, Obear & Campbell, all of Washington, D.C., for petitioner.

J. Ellis Mundy, U. S. Atty., Harvey H. Tisinger, Asst. U. S. Atty., and Eugene Ferry Smith, Colonel, J. A. G. D. Third Army Judge Advocate, all of Atlanta, Ga., and Nicholas R. Voorhis, Lt. Colonel, J. A. G. D., Office of Judge Advocate General, of Washington, D.C., for respondent.

RUSSELL, District Judge.

The petitioner, Jack W. Durant, was tried and convicted by a general court martial of the charge of violation of the 93rd Article of War, 10 U.S.C.A. § 1565, in that he did in conjunction with others named, feloniously take and steal from Kronberg Castle, Germany, numerous articles of jewelry and other personal property, including crown jewels in large quantity and of great value. He was sentenced to imprisonment for fifteen years, but this was later commuted to fourteen years and he is now confined at the Federal Penitentiary at Atlanta.

The petitioner sets up numerous grounds of alleged illegality of his restraint. The attacks are predicated upon the contentions that at the time of his arrest he was on terminal leave and therefore not subject to military law; that there was a failure to comply with the requirements of Article of War 70, 10 U.S.C.A. § 1542, both as to the first charges against him, upon which he was not tried, and as to the second charges upon which he was tried, for the reasons specified in detail in the petition, and the nature of which will appear from the findings of fact hereinafter entered. Further, the court martial was, for the reasons stated, not lawfully appointed, so that the proceedings were void ab initio; that there was an unlawful absence of an assistant trial judge advocate and participation by an unauthorized assistant trial judge advocate at the first session of the court martial. It is further alleged that the court martial lost jurisdiction of the petitioner and the subject matter by reason of its moving from Frankfort-Am-Main, Germany, to Washington, D. C., and therefore the subsequent resumption of the trial in Frankfort did not restore jurisdiction,

and all proceedings were void. Another attack is predicated upon the contention that the stenographic notes of a portion of the trial were not properly reconstructed, whereby the court martial lost jurisdiction. It is further contended that in the proceeding there was a lack of due process of law in that evidence of an alleged admission made by him to an attorney and doctor of medicine was admitted which was a violation of the confidential relationship between them; because the court martial received in evidence testimony against him given by specified high ranking enemy nationals; because of the misconduct of the trial judge advocate throughout the trial, and because there was a trial upon a joinder of grave and petty charges, so that the entire trial "discloses such a disregard of the fundamentals of fairness and justice, and such a 'totality of errors,' as to constitute a want of due process of law," and that the sentence is "excessively harsh, cruel and unjust."

The facts in the case are not in substantial dispute, though there is of course serious disagreement as to the legal effect of such facts, and in some instances, as to the effect of the absence of what is contended are material facts. The court martial record is in evidence and consists of an extremely voluminous record containing numerous exhibits. Oral testimony has been presented upon the hearing in this court. The material facts relate to the questions presented in this proceeding seeking the release of the petitioner from confinement, and are found as follows:

Petitioner had held commissions in the Army Reserve from his graduation from College until his entrance on August 26, 1940, to active duty with the Air Corps. He was promoted to Major, Army of the United States, on April 3, 1942; to Lieutenant Colonel on September 29, 1942; and to Colonel on November 10, 1944. From August 10, 1945, to March 4, 1946, he was Executive Officer to the Assistant Chief of Staff G-1, Headquarters, United States Forces, European Theater. On May 16, 1946, in Washington, D. C., he was relieved from assignment to duty in the European Theater and assigned to Headquarters, Army Air Forces, Executive Office, Washington, D. C., for separation purposes. On that date, at the separation center, Pentagon Building, Washington, D. C., he was "processed for separation," at which time he executed all documents required by the Army. On May 17th, along with numerous other officers, by Special Orders No. 113, it was provided that he was relieved from assignment and duty and assigned to separation center listed for record purposes only and will proceed "to his home shown and revert to inactive status on date specified." This specification of home and effective date of release from active duty is stated "Arlington, Va., eff 23 July" which is construed to be effective as a release from active duty the 23rd of July. The order further contained a grant of 68 days of leave effective May 17th. On the prior day he had signed such papers as application for reserve appointment, finance vouchers and his personal identification card with a photograph was perforated "inactive." On either the 16th or 17th of May, he executed that portion of his certificate of service requiring his signature which contained the statement "Date of relief from active duty 23 July 1946" and also "Reason and Authority for Separation Relief from Active Duty Par 9 SO 113 WD 17 May 1946 RR1-1," presumably the order just above referred to, and acknowledged receipt of the Army Occupational Medal, the issuance of Lapel Button, and the statement "On terminal leave from 17 May 1946 to 23 July 1946 inclusive." This certificate was later delivered to him after his arrest and confinement, but prior to the court martial trial. He was given an appointment effective May 17, 1946, as a Colonel in the Air Reserve; a form letter from the Adjutant General expressing appreciation of his acceptance of the Reserve Commission; Personal Report Form for a reserve officer; form letter from Veterans Administration congratulating him "upon completion of his service" (in the Armed Forces); and a certificate of thanks from President Truman. On June 2, 1946, an order was issued by order of the Secretary of War by the Adjutant General by which so much of paragraph 9, Special Orders 113, referred to as pertaining to petitioner "that states

such officer will revert to inactive status on 23 July 1946, is hereby revoked. The unexecuted portion of terminal leave granted Colonel Jack W. Durant by above mentioned Special Orders is hereby terminated effective 2 June 1946," and named officer "relieved from assignment to Separation Center * * * and is assigned to "Reception Station #7, Fort Sheridan, Illinois." Meanwhile, at about two o'clock, on the morning of June 3rd, military police personnel came to his hotel in Chicago and advised him that "he had been recalled to active duty" and was to report to Fort Sheridan by midnight of that night. Petitioner was not placed under arrest, but was later advised that a Lieutenant Colonel Pierce would like to interview him at the office of a Mr. Leonard Keeler. He went there and found that Colonel Pierce was engaged in criminal investigations for the Army, and from one of the sections of the Provost Marshal General's office. During this interview he was informed that he was under arrest, and has continued in confinement from that date. Some time after June 3rd, either in Ft. Myers, Virginia, or Frankfort, Germany, but before July 23rd, he was given a copy of the War Department Order next above referred to. While in Chicago, petitioner was introduced by Colonel Pierce to a Dr. Snyder, who was a medical doctor and also a lawyer, who told petitioner that he had been in police work for several years; that he had talked to many people who were in trouble, but according to his testimony made clear that there was to be no relationship of physician and patient and also that he was not acting as his attorney "or anything of the sort." During conversations with Dr. Snyder petitioner made some admissions concerning the location of some of the jewels with a "fence," and in response to a statement by Dr. Snyder that it was a shame that the jewels were broken up, replied "yes, that is too bad, I am sorry we did it." Subsequently, after numerous phone calls which petitioner was permitted to make away from the officers having him in custody, a portion of the jewels were retrieved from the check room in one of the railroad stations in Chicago, after obtaining a check which had been placed in a phone booth in such station. Another effort to secure the return of other of the jewels failed after the same procedure which had formerly been successful had been followed. Thereafter, petitioner was returned to Ft. Myers at Washington, D. C. On June 8th, charges of violation of the 93rd Article of War were filed against the petitioner with specifications in general that the petitioner and Captain Kathleen B. Nash did embezzle designated jewelry which may be referred to as the Kronberg crown jewels and did conspire to embezzle such jewelry. No investigating officer was appointed to investigate these charges. On June 16, 1946, interim counsel for the petitioner called to the attention of the Commanding General, Military District of Washington, these facts and that the officer (petitioner) considered to be prejudicial the fact that the provisions of Article of War 70 were not complied with prior to their departure from the United States to Germany, and that he had been instructed to oppose with all means available their removal from the United States until compliance with Article of War 70 and his rights thereunder had been afforded him; he also requested that petitioner be afforded the right to counsel of his own choosing during the official investigation. No reply was received. The petitioner was transferred and taken to Germany about June 17, 1946, and on August 12th Captain Brumbaugh, who had theretofore during the week of the 16th or 17th of June been detailed as petitioner's individual counsel, called the attention of the Commanding Officer, Headquarters, European Theater, to the provisions of the 70th Article of War, stating that no charges had been preferred (obviously referring to charges in Europe where the accused was then confined), and requested release from confinement. His request was denied. On August 12th, or August 13th, and November 13th, requests for the release of the accused from confinement, for investigation of the charges of June 8th or their withdrawal, and that the petitioner be brought to trial or released, were presented either by the petitioner or his counsel. An investigating officer was appointed in Europe on November 20th and the charges upon which petitioner was tried, investi-

gated. The charges were read to petitioner and his counsel, Captain Brumbaugh; his counsel was permitted to read a copy of the statements of witnesses, but he was not at that time given the allied papers comprising the case, though they were delivered on December 9th. Copy of the charges was not delivered until December 2nd. The investigation covered a period of approximately three days; counsel for petitioner cross examined the witnesses who were produced, but there is no substantial evidence that any witnesses who were available were not called. Petitioner's counsel had reached Germany on June 27, 1946, and had, prior to the filing and investigation of the charges upon which petitioner was tried, observed the trials of Major Watson and Captain Kathleen Nash Durant, charged with the same offense, in which it must be assumed the facts were fully developed so that he had notice of all material evidence surrounding petitioner's case.

Petitioner on June 15, 1946, was transferred from the military district of Washington and directed to report to the Theater Provost Marshal, Headquarters, United States Forces, European Theater. On June 20, 1946, by an Internal Route Slip, from G–1, Military Personnel Section, Headquarters, United States Forces, Eastern Theater, to Headquarters Command, United States Forces, Eastern Theater, the following directive was issued:

"1. Responsibility for conduct of courts-martial in Kronberg case (Col. J. W. Durant, Major D. F. Watson, Capt. Durant) has been placed with the Commanding Officer, Headquarters Command. To avoid administrative confusion and to insure expeditious action on personnel matters pertaining to this case, the following policy is announced:

"(a) All accused, court members, witnesses and other personnel procured for trials will be attached to Headquarters Command, USFET.

"(b) CO Headquarters Command will maintain necessary records on requests for witnesses and other personnel, action taken to secure personnel, and reports of location, availability, arrival, release, and departure of witnesses.

"(c) Release of personnel, upon completion of testimony or other need, will be at the discretion of CO, Headquarters Command.

\* \* \* \* \* \*

"(e) After due consideration of the need for the presence of specific witnesses and the alternative desirability of securing depositions, CO, Headquarters Command will request AG, this headquarters, in writing, to secure witnesses not available to Headquarters Command. Upon such request AG, this headquarters will (1) issue orders directing military and civilian witnesses assigned this command to report to Headquarters Command by fastest available transportation, (2) Request AGWAR to secure witnesses located in ZI, and (3) make necessary contact with Allied Contact Section or G–5 Division this headquarters, respectively, to secure allied military and civilian witnesses or German civilians requested by CO, Headquarters Command.

"(f) Request for special defense counsel or other court personnel will be coordinated by CO, Headquarters Command with Major Command or Staff Division to which personnel are assigned, to determine availability for such duty. Action to secure presence of such personnel will be handled as for witnesses in subparagraph 1(e) above.

\* \* \* \* \* \*

"(h) Direct contact between Headquarters Command and other major commands on this case is authorized."

On November 21, 1946, Internal Route Slip issued from G–1, Military Personnel, USFET, to Headquarters Command, USFET, stating that:

"1. The following court is established to try the Colonel Durant case. \* \* \* (naming the officers, including the trial judge advocate and assistant trial judge advocate, and defense counsel and assistant defense counsel, giving the commands to which they belonged, and, for the members, their respective dates of rank. \* \*

"2. It is requested that at such time as officers are to appear for trial, Major Kundert, this division, be notified so that ar-

rangements can be made to have officers report at designated time and place."

By paragraph 3, Special Orders 333, Headquarters Command, USFET, dated November 29, 1946, a general court martial was "appointed to meet at Frankfort-Am-Main, Germany, or else where as the President of the Court may deem necessary, on this date or as soon thereafter as it is practical, for the trial of such persons as may properly be brought before it." The officers detailed to the court by this order were the same as those named in paragraph one of the Internal Route Slip of November 21, 1946, except that in the detailing order, the officers were listed in accordance with their rank and seniority. To this general court martial the charges against the petitioner were later referred.

Some question arose as to the legality of the court and inquiry was made of the Appointing Authority on January 3, 1947. The Commanding General replied that all the members of the court were made available to him by verbal orders of the Commanding General, General McNarney, under date of November 21, 1946. Enclosed with the reply was written confirmation of January 8, 1947, by paragraph 27 Special Orders No. 8, Headquarters, USFET, in which the following language appears:

"VOCG (verbal orders of commanding general) making available the following named O for duty with the CG Hg. Comd US Forces European Theater for dy with the Col Jack W. Durant court are made of record the urgency having been such as to prevent the issuance of orders in advance." (Parenthetical words supplied).

One of the members of the Court, who was stated to have been made available, was at that time attached to the Headquarters Command. One member of the court was ordered by Lieutenant General Clay, then the Commander in Chief of the European Command and Military Governor, to report back to the United States, and withdrew from the court. Some of the officers had received no written orders definitely attaching them to the Headquarters Command, but all received travel orders to Frankfort for the purpose of serving as members of the court. The original commands of the officers were in the various units of the United States Army throughout Europe. From the orders of the members of the court issued by their immediate commanding general, it appears that the orders of some members of the court bore a date, as to written orders, subsequent to the appointment of the court, and in instances where verbal orders were confirmed and made of record, such verbal orders were of date contemporaneous with the date of the appointment of the court.

The Court Martial convened on December 11, 1946, and after discussion, a motion for a continuance of five days presented by the defense, was granted. No further action was taken. On this date, it appears from the record that Lt. Argo, in the capacity of Assistant Trial Judge Advocate, was present, but he was not formally detailed until December 14, 1946. However, he did not participate in any way on December 11th other than to sit at the counsel table. The court met next on December 16, 1946, and proceeded with the hearing of challenges and at this time the accused was arraigned. Special pleas were interposed prior to arraignment, and these were overruled. Upon being called upon to plead, the accused stood mute as to all charges and specifications, and the trial proceeded with the defendant represented by Captain Brumbaugh, individual counsel appointed June 17, 1946, and defense counsel, Major Bryan, who had arrived December 5, 1946. The trial continued until January 17, 1947, and thereafter in Washington, D. C. where it resumed sessions on February 10, 1947, pursuant to adjournment to meet at the call of the President of the Court. The trial was continued in Washington from February 10th to April 4, 1947, and the court adjourned to resume the trial in Frankfort April 21, 1947, where it was completed April 30, 1947. Prior to removal, the request of the President that the Court be directed to adjourn to the United States in order to hear the testimony of certain witnesses in the case, was approved by the Commanding General of Headquarters Command, the Commanding General USFET, and communicated to the War Department which authorized the Court to proceed to the United States. The advice

of the Judge Advocate General was also sought and he ruled that there would be no illegality in continuing the trial in Washington, D. C. During the period petitioner was in Germany, he was quartered in a hotel, his counsel had access to him, but for a time was not permitted to take witnesses or papers to his room. There was a relaxation of these restrictions after November 21st when the charges were filed. However, approximately a week before the trial, defense counsel was furnished an office, a telephone and a secretary. While in Washington, counsel was furnished a room and some secretarial service, though some of it may not have been entirely satisfactory.

■ As a finding which must in its nature be of both law and fact, the Court finds that the conduct of the trial judge advocate, in some of his side remarks and innuendos, and the nature of some of his statements, while subject to criticism, did not prejudice the accused before the Court, and in fact, as stated during the trial by the law member, "if the trial judge advocate makes inflammatory and prejudicial statements, I am inclined to think that the prejudice, if any, will be against his case rather than in favor of it, if he makes such statements." I am unable to find from an examination of the conduct of the trial that the Court was influenced prejudicially to the accused by the conduct of the trial judge advocate.

At the risk of unnecessary and excessive factual findings, the Court has endeavored to detail the facts involved in the legal contentions of the petitioner so that, without extended discussion, the application of law by the Court may become readily apparent without extended discussion or reiteration of facts. The burdensome pressure of very heavy trial duties presents little opportunity for discussion and distinction of the numerous authorities both in military and civil law ably presented on behalf of the petitioner and the respondent. The oral and written arguments of the parties and the authorities cited have been fully considered, and thereupon, the Court reaches the following conclusions of law:

■ Under the facts appearing, the petitioner was, at the time of his arrest, a person subject to military law and to prosecution by court martial for an offense committed during his service as an officer of the United States Army. By the terms of the order relieving him from assignment and duty, he did not revert to an inactive status, nor would he have been released from active duty until July 23, 1946. The revocation of the unexecuted portion of the terminal leave, and the revocation of the order by which he was to revert to inactive status on 23 July, 1946, effectually rendered him subject to the orders of the military authorities. Hironimus v. Durant, 4 Cir., 168 F.2d 288, certiorari denied 335 U.S. 818, 69 S.Ct. 40.

■ The failure of the military authorities to direct an investigation of the charges against petitioner dated June 8, 1946, and his continuous confinement without such investigation and trial, until November, 1946, when the charges upon which petitioner was tried and convicted were filed and investigated, presents no ground of avoidance of the legal effect of the trial and conviction upon the charges later filed and proceeded with. It might be stated, in extenuation of the delay, that the charges involved a case of magnitude and its preparation required extensive investigation. Furthermore, separate trials were had of two others alleged to have been implicated in the offense, and required the same witnesses and each of these trials continued for several weeks. There is no substantial showing in the record that this confinement or delay prejudiced the petitioner in his defense. While it is dangerous to attempt any analogy between military procedure and procedure in the civil courts, the case is not materially different from an attempt to avoid conviction in a civil court because the defendant was incarcerated for a considerable period before trial.

■ The investigation of the charges filed against petitioner November 21, 1946 was in substantial accord with the requirements of Article of War 70.

■ In view of the fact that the court martial granted the continuance of five days as requested by defense counsel, no merit is discovered in the contention of the

petitioner that he was not afforded ample time for the preparation of his defense.

While there are rulings of the Judge Advocate General to the effect that the participation of an unauthorized court member in the trial of an accused will invalidate a finding of guilty, under the circumstances of this case, where the Lt. Argo sat for only one preliminary session, did not participate in any manner therein, and was legally detailed prior to arraignment, such presence did not destroy the validity of the subsequent proceedings.

The court martial was legally constituted in that, under the facts appearing, the officers detailed to the court were under the command of the appointing authority for such purpose. The order of the Commanding General, USFET, of June 20, 1946, in legal effect, placed subject to the orders of the Commanding General, Headquarters, USFET, such officers under the overall command of the Commanding General, USFET, as might be detailed for the Court by the Commanding General, Headquarters Command. Thus construed, the general order was specifically confirmed by verbal orders and the Internal Route Slip from the Commanding General, USFET, of November 21, 1946, and confirmed and reduced to record by written orders of January 8, 1947. The evidence shows in reality that the appointing authority, already authorized to appoint court martials, had made available to him, and thus subject to his command, such officers, so made available, as he might detail. There would appear to be no illegality in such a procedure, for a supreme or overall commander may grant to a unit commander authority to designate by detail to a court martial, officers specified by the unit commander from those made available en masse by the supreme command. Following such authorization, the officers detailed are "officers of the command" within the terms of Article of War 4, Title 10, U.S.C.A. § 1475. Under the terms of the Fourth Article of War, "All officers in the military service of the United States * * * shall be competent to serve on courts-martial for the trial of any persons who may lawfully be brought before such courts for trial."

A case which appears to be similar to the present, and to afford a precedent for the ruling here made, is that of McRae v. Henkes, 8 Cir., 273 F. 108.

To one accustomed to the fixed territorial limits of civil courts, and the venue requirements of prosecution for offenses, the question here presented with reference to the validity of the removal of the court from Frankfort to Washington, D. C., and return to Frankfort, is not easy of solution. Neither the Articles of War, nor the Manual for Courts Martial prescribe any limits upon where a court martial shall be convened, or any prohibition against the court sitting outside the area under the command of the Appointing Authority. The Manual for Courts Martial does provide in paragraph 36, page 27, that "courts should be assembled at posts or stations where trial will be attended with the least expense and delay." Cogent reasons appear why in time of war it might become necessary for a court martial to remove its original place of sitting, and that this should be permitted without any loss of jurisdiction. Other possible situations can be conceived where the movement of a court could result in such prejudice to the rights of the accused as to properly destroy the jurisdiction of the court to proceed with the trial of the charges against him. Furthermore, it appears true that one of the underlying principles of the validity of a military court is that command thereof must be vested in the appointing and convening authority. Thus in case of any removal of the court from the territorial area of the appointing authority, the question of continuity of such command would of course be involved. It may be that, as stated with reference to the orders of a superior commander making available officers for detail upon a court martial, the effect of the order of the Secretary of War permitting such removal would be a continuance of the command of the appointing authority, and the negation of power of command of the court by the commanding officer of any area or territory into which the court might be removed. In determining as an original proposition the strict legality of such removal, these and other questions will arise and must be determined. How-

ever, this court is dealing with the question on an application for the writ of habeas corpus, after conviction, and after the procedure provided by law for the review and correction of errors in military courts has been employed and in which the legality under military law of the removal of the court in the present instance has been approved. Such ruling by the military justice authorities, in the case of a person subject to military law, is entitled to great weight in this proceeding. No claim of substantial prejudice is shown to have resulted to the petitioner by reason of the removal of the court to Washington, D.C. The contention is that the removal, per se, destroyed the jurisdiction of the court and rendered the proceedings nugatory as a matter of law. In the absence of some showing of prejudice, this court does not feel compelled to explore and determine whether any and all removals of a court martial from the territorial area of the command of its convening authority is fatal to further jurisdiction of such court. The matter has been considered by the military authorities and approved, and no sufficient illegality appears to authorize the annulment of the trial, conviction and sentence of the petitioner.

The loss of the transcript of the evidence adduced on the afternoon of February 12, 1947, in view of the recall by the court of the witnesses who had then testified, and the court's reconstruction of the record from the notes kept by its members and some depositions, did not result in the court's loss of jurisdiction.

Under the circumstances of this case, none of the contentions that the sentence was invalid because in the conduct of the prosecution the petitioner has been deprived of due process of law, for the reasons urged, considered singly, or, as petitioner urges, as a combination or totality of errors constituting such deprivation of due process as to authorize his release, authorize a finding that they either singly or collectively resulted in a denial to the petitioner of the substance of a fair trial so as to oust the juris-

diction of the court. Thus, neither the alleged illegal arrest, nor the method of questioning of petitioner in Chicago, nor the admission of the evidence of Dr. Snyder, nor the failure, while in Chicago, at the beginning of the investigation, to allow petitioner the services of an attorney at law as requested, nor the lengthy confinement of petitioner, nor restrictions upon his consultation with his counsel in Germany, nor the failure to furnish more elaborate facilities to petitioner and his counsel in the preparation and conduct of the trial, nor the method in which the pretrial investigation was conducted, nor the conduct of the trial judge advocate during the course of the trial, considered singly and collectively, are sufficient to authorize the finding that by such alleged errors petitioner was deprived of the due process of law guaranteed to him by the Fifth Amendment to the Constitution.

The question of the legality of the constitution of the court, has not received consideration or decision by the court martial and the reviewing and confirming authorities in accordance with military law. All other substantial questions now presented were considered by the military justice authorities and ruled contrary to the contentions of the petitioner. As to persons subject to military law, the method of procedure provided thereby for the trial, appeal, review and confirmation, is the manner provided by law for the correction of errors. While some of the methods and procedure might not appeal to a civil court as in strict accord with our ideas of the administration of justice in civil courts, nevertheless such military procedures have the sanction of law. Thus, where there has been a military trial and the review and confirmation provided by the statute, there remains for determination by a habeas corpus court only the question of jurisdiction to hear and determine and the legality of sentence. In the absence of a clear showing that jurisdiction never attached, or by reason of deprivation of constitutional rights that jurisdiction was lost, there is scant room for the exercise of any independent power of determination

on the merits of the court martial proceeding by a habeas corpus court. In the present case, no lack or loss of jurisdiction is shown, and the sentence imposed is within the limits permitted by law.

It is therefore considered, ordered and adjudged that the writ heretofore issued should be discharged, and that petitioner should be, and hereby is, remanded to the custody of the respondent.