# UNITED STATES EX REL. TOTH *v.* QUARLES, SECRETARY OF THE AIR FORCE.

No. 3. Argued February 8–9, 1955.—Restored to docket for reargument June 6, 1955.—Reargued October 13, 1955.—Decided November 7, 1955.

*William A. Kehoe, Jr.* argued the cause for petitioner. With him on the briefs were *Al. Philip Kane, Charles V. Koons, John J. McGrath, Peter F. Flaherty, Joseph H. Ridge, James F. Smith* and *L. Pat McGrath.*

*Solicitor General Sobeloff* argued the cause for respondent on the reargument, and *Marvin E. Frankel* on the original argument. With them on the brief on the original argument were *Assistant Attorney General Olney, Beatrice Rosenberg, Carl H. Imlay* and *Chester W. Wilson.* With them on the brief on the reargument was *Mr. Olney.*

*Ralph B. Gregg* filed a brief for the American Legion, as *amicus curiae,* urging reversal.

MR. JUSTICE BLACK delivered the opinion of the Court.

After serving with the United States Air Force in Korea, Robert W. Toth was honorably discharged. He returned to his home in Pittsburgh and went to work in a steel plant. Five months later he was arrested by military authorities on charges of murder and conspiracy to commit murder while an airman in Korea.[1] At the time of arrest he had no relationship of any kind with the military. He was taken to Korea to stand trial before a court-martial under authority of a 1950 Act of Congress.[2] The Court of Appeals sustained the Act, rejecting the contention that civilian ex-servicemen like Toth could not constitutionally be subjected to trial by court-martial. 94 U. S. App. D. C. 28, 215 F. 2d 22. We granted certiorari to pass upon this important constitutional question. 348 U. S. 809.[3]

The 1950 Act cannot be sustained on the constitutional power of Congress "To raise and support Armies," "To declare War," or to punish "Offences against the Law of

[1] The charges were violations of Articles 118 and 81 of the Uniform Code of Military Justice, 64 Stat. 140, 134, 50 U. S. C. §§ 712 and 675.

[2] Art. 3 (a), Uniform Code of Military Justice, 64 Stat. 109, 50 U. S. C. § 553, provides: "Subject to the provisions of article 43, any person charged with having committed, while in a status in which he was subject to this code, an offense against this code, punishable by confinement of five years or more and for which the person cannot be tried in the courts of the United States or any State or Territory thereof or of the District of Columbia, shall not be relieved from amenability to trial by courts-martial by reason of the termination of said status."

[3] This habeas corpus proceeding was brought in the District Court for the District of Columbia by Toth's sister while he was held in Korea. Without passing on any constitutional question the District Court ordered Toth discharged on the ground that he should not have been carried to Korea for trial without a hearing. 113 F. Supp. 330, 114 F. Supp. 468.

14

Nations."[4] And this assertion of military authority over civilians cannot rest on the President's power as commander-in-chief, or on any theory of martial law. See *Ex parte Milligan,* 4 Wall. 2, 124–127. The Government's contention is that the Act is a valid exercise of the power granted Congress in Article I of the Constitution "To make Rules for the Government and Regulation of the land and naval Forces," as supplemented by the Necessary and Proper Clause.[5]

This Court has held that the Article I clause just quoted authorizes Congress to subject persons actually in the armed service to trial by court-martial for military and naval offenses.[6] Later it was held that court-martial jurisdiction could be exerted over a dishonorably discharged soldier then a military prisoner serving a sentence imposed by a prior court-martial.[7] It has never been intimated by this Court, however, that Article I military jurisdiction could be extended to civilian ex-soldiers who had severed all relationship with the military and its institutions.[8] To allow this extension of military

---

[4] See *Ex parte Quirin,* 317 U. S. 1; *In re Yamashita,* 327 U. S. 1.

[5] The Fifth Amendment provides that "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger . . . ." This provision does not grant court-martial power to Congress; it merely makes clear that there need be no indictment for such military offenses as Congress can authorize military tribunals to try under its Article I power to make rules to govern the armed forces.

[6] *Dynes* v. *Hoover,* 20 How. 65.

[7] *Kahn* v. *Anderson,* 255 U. S. 1.

[8] In 1863 Congress passed a statute authorizing trial of ex-soldiers for commission of fraud against the Government while in the service; this law also authorized court-martial trial of contractors not part of the military forces. 12 Stat. 696. The latter provision of the 1863 law appears never to have been sustained by any court. Lower

authority would require an extremely broad construction of the language used in the constitutional provision relied on. For given its natural meaning, the power granted Congress "To make Rules" to regulate "the land and naval Forces" would seem to restrict court-martial jurisdiction to persons who are actually members or part of the armed forces. There is a compelling reason for construing the clause this way: any expansion of court-martial jurisdiction like that in the 1950 Act necessarily encroaches on the jurisdiction of federal courts set up under Article III of the Constitution where persons on trial are surrounded with more constitutional safeguards than in military tribunals.

Article III provides for the establishment of a court system as one of the separate but coordinate branches of the National Government. It is the primary, indeed the sole business of these courts to try cases and controversies between individuals and between individuals and the Government. This includes trial of criminal cases.

---

courts have disagreed as to the constitutional validity of the provision authorizing ex-soldiers to be tried. See, *e. g.*, *In re Bogart*, 3 Fed. Cas. 796. Compare *Ex parte Henderson*, 11 Fed. Cas. 1067; *United States ex rel. Flannery* v. *Commanding General*, 69 F. Supp. 661, reversed by stipulation in unreported order of the Second Circuit, No. 20235, April 18, 1946. See *United States ex rel. Hirshberg* v. *Cooke*, 336 U. S. 210. A statute authorizing court-martial trial of inmates of the Soldiers' Home has been ruled unconstitutional by the Judge Advocate General of the Army. Dig. Op. J. A. G. (1912), pp. 1010, 1012. It was declared that "such inmates are not a part of the Army of the United States, but are civilians." *Id.*, at 1012. Col. Winthrop, concededly a leading authority on military law, expressed the view that "this class of statutes, which in terms or inferentially subject persons formerly in the army, but become finally and legally separated from it, to trial by court-martial, are all necessarily and alike unconstitutional . . . ." 1 Winthrop, Military Law and Precedents (2d ed. 1896), 146. The War Department reprinted this classic volume for the guidance of the Army in 1920. Winthrop, Military Law and Precedents (2d ed., Reprint 1920).

These courts are presided over by judges appointed for life, subject only to removal by impeachment. Their compensation cannot be diminished during their continuance in office. The provisions of Article III were designed to give judges maximum freedom from possible coercion or influence by the executive or legislative branches of the Government. But the Constitution and the Amendments in the Bill of Rights show that the Founders were not satisfied with leaving determination of guilt or innocence to judges, even though wholly independent. They further provided that no person should be held to answer in those courts for capital or other infamous crimes unless on the presentment or indictment of a grand jury drawn from the body of the people. Other safeguards designed to protect defendants against oppressive governmental practices were included. One of these was considered so important to liberty of the individual that it appears in two parts of the Constitution. Article III, § 2, commands that the "Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed." And the Sixth Amendment provides that "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed . . . ." This right of trial by jury ranks very high in our catalogue of constitutional safeguards.[9]

---

[9] A declaration of rights adopted by nine colonies in 1765 contained this statement: "That trial by jury, is the inherent and invaluable right of every British subject in these colonies." Harvard Classics, Volume 43, p. 148. The Declaration of Independence stated as one of the grievances of the colonies that the King of Great Britain had

We find nothing in the history or constitutional treatment of military tribunals which entitles them to rank along with Article III courts as adjudicators of the guilt or innocence of people charged with offenses for which they can be deprived of their life, liberty or property. Unlike courts, it is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise. But trial of soldiers to maintain discipline is merely incidental to an army's primary fighting function. To the extent that those responsible for performance of this primary function are diverted from it by the necessity of trying cases, the basic fighting purpose of armies is not served. And conceding to military personnel that high degree of honesty and sense of justice which nearly all of them undoubtedly have, it still remains true that military tribunals have not been and probably never can be constituted in such way that they can have the same kind of qualifications that the Constitution has deemed essential to fair trials of civilians in federal courts. For instance, the Constitution does not provide life tenure for those performing judicial functions in military trials. They are appointed by military commanders and may be removed at will. Nor does the Constitution protect their salaries as it does judicial salaries. Strides have been made toward making courts-martial less subject to the will of the executive department which appoints, supervises and ultimately controls them. But from the very nature of things, courts have more independence in passing on the life and liberty of people than do military tribunals.

Moreover, there is a great difference between trial by jury and trial by selected members of the military forces.

deprived the colonists of the benefits of trial by jury in many cases and that he had "affected to render the Military independent of and superior to the Civil power." Another charge was that he had transported colonials "beyond Seas to be tried for pretended offences."

It is true that military personnel because of their training and experience may be especially competent to try soldiers for infractions of military rules. Such training is no doubt particularly important where an offense charged against a soldier is purely military, such as disobedience of an order, leaving post, etc. But whether right or wrong, the premise underlying the constitutional method for determining guilt or innocence in federal courts is that laymen are better than specialists to perform this task. This idea is inherent in the institution of trial by jury.

Juries fairly chosen from different walks of life bring into the jury box a variety of different experiences, feelings, intuitions and habits.[10] Such juries may reach completely different conclusions than would be reached by specialists in any single field, including specialists in the military field.[11] On many occasions, fully known to the Founders of this country, jurors—plain people—have manfully stood up in defense of liberty

---

[10] Chief Justice Cooley said: "The trial of criminal cases is by a jury of the country, and not by the court. The jurors, and they alone, are to judge of the facts, and weigh the evidence. The law has established this tribunal because it is believed that, from its numbers, the mode of their selection, and the fact that the jurors come from all classes of society, they are better calculated to judge of motives, weigh probabilities, and take what may be called a common sense view of a set of circumstances, involving both act and intent, than any single man, however pure, wise and eminent he may be. This is the theory of the law; and as applied to criminal accusations, it is eminently wise, and favorable alike to liberty and to justice." *People* v. *Garbutt,* 17 Mich. 9, 27.

[11] "Juries undoubtedly may make mistakes: they may commit errors: they may commit gross ones. But changed as they constantly are, their errors and mistakes can never grow into a dangerous system. The native uprightness of their sentiments will not be bent under the weight of precedent and authority. The esprit du corps will not be introduced among them; nor will society experience from them those mischiefs, of which the esprit du corps, unchecked, is sometimes productive." II Wilson's Works (Andrews ed. 1896) 222.

against the importunities of judges and despite prevailing hysteria and prejudices.[12] The acquittal of William Penn is an illustrious example.[13] Unfortunately, instances could also be cited where jurors have themselves betrayed the cause of justice by verdicts based on prejudice or pressures. In such circumstances independent trial judges and independent appellate judges have a most important place under our constitutional plan since they have power to set aside convictions.[14]

The 1950 Act here considered deprives of jury trial and sweeps under military jurisdiction over 3,000,000 persons who have become veterans since the Act became effective. That number is bound to grow from year to year; there are now more than 3,000,000 men and women in uniform.[15] These figures point up what would be the enormous scope of a holding that Congress could subject every ex-serviceman and woman in the land to trial by court-martial for any alleged offense committed while he or she had been a member of the armed forces. Every veteran discharged since passage of the 1950 Act is subject to military trial for any offense punishable by as much as five years' imprisonment unless the offense is now punishable in a civilian court. And one need only glance at the Military Code to see what a vast number and variety of offenses are thus brought under

---

[12] An outstanding instance is the *Dean of St. Asaph's Case,* 21 How. St. Tr. 847, discussed in Stryker, For the Defense, 119–136.

[13] *Penn and Mead's Case,* 6 How. St. Tr. 951. After trial the jurors were fined for acquitting Penn contrary to the court's instructions. One was imprisoned for not paying the fine, but the Court of Common Pleas released him in a habeas corpus proceeding, upholding the freedom of the jury to decide the case. *Bushell's Case,* 6 How. St. Tr. 999.

[14] See II Wilson's Works (Andrews ed. 1896) 222.

[15] Bureau of the Census, Current Population Reports, Series P–25, No. 101 (U. S. Dept. Commerce 1954).

military jurisdiction.[16]   Included within these are crimes such as murder, conspiracy, absence without leave, contempt toward officials, disrespect toward superior officers, willful or neglectful loss, damage, or destruction of government property, making false official statements, dueling, breach of the peace, forgery, fraud, assault, and many others.[17]   It is true that with reference to some of these offenses, very minor ones, veterans cannot now be tried because of a presidential order fixing the punishment for such offenses at less than five years.[18]   But that amelioration of the Military Code may be temporary, since punishment can be raised or lowered at the will of the President.   It is also true that under the present law courts-martial have jurisdiction only if no civilian court does.   But that might also be changed by Congress. Thus there is no justification for treating the Act as a mere minor increase of congressional power to expand military jurisdiction.   It is a great change, both actually and potentially.

Fear has been expressed that if this law is not sustained discharged soldiers may escape punishment altogether for crimes they commit while in the service.   But that fear

---

[16] Arts. 77–134, Uniform Code of Military Justice, 64 Stat. 133–143, 50 U. S. C. §§ 671–728.

[17] A particularly sweeping offense, punishable by death and not subject to any statute of limitations, is found in Article 94, which provides in part that anyone "(2) who with intent to cause the overthrow or destruction of lawful civil authority, creates, in concert with any other person or persons, revolt, violence, or other disturbance against such authority is guilty of sedition; (3) who fails to do his utmost to prevent and suppress an offense of mutiny or sedition being committed in his presence, or *fails to take all reasonable means to inform his superior or commanding officer of an offense of mutiny or sedition which he* knows or *has reason to believe is taking place,* is guilty of a failure to suppress or report a mutiny or sedition." (Emphasis supplied.)

[18] See Table of Maximum Punishments, 127c, MCM, 1951, 16 Fed. Reg. 1364–1368.

is not warranted and was not shared by the Judge Advocate General of the Army who made a strong statement against passage of the law.[19]   He asked Congress to "confer jurisdiction upon Federal courts to try any person for an offense denounced by the [military] code if he is no longer subject thereto.   This would be consistent with the fifth amendment of the Constitution."   The Judge Advocate General went on to tell Congress that "If you expressly confer jurisdiction on the Federal courts to try such cases, you preserve the constitutional separation of military and civil courts, you save the military from a lot of unmerited grief, and you provide for a clean, constitutional method for disposing of such cases."   It is conceded that it was wholly within the constitutional power of Congress to follow this suggestion and provide for federal district court trials of discharged soldiers accused of offenses committed while in the armed services.   This concession is justified.   U. S. Const., Art. III, § 2; and see, *e. g., Jones* v. *United States,* 137 U. S. 202, 211–212; *United States* v. *Bowman,* 260 U. S. 94, 97–98; *Skiriotes* v. *Florida,* 313 U. S. 69, 73–74. There can be no valid argument, therefore, that civilian ex-servicemen must be tried by court-martial or not tried at all.   If that is so it is only because Congress has not seen fit to subject them to trial in federal district courts.

None of the other reasons suggested by the Government are sufficient to justify a broad construction of the constitutional grant of power to Congress to regulate the armed forces.   That provision itself does not empower Congress

---

[19] Hearings before Subcommittee of Senate Committee on Armed Services on S. 857 and H. R. 4080, 81st Cong., 1st Sess. 256–257.   The Assistant General Counsel of the Office of Secretary of Defense, who was chairman of a committee that helped draft the Uniform Code of Military Justice, expressed doubts as to the constitutionality of Article 3 (a).   Hearings before Subcommittee of House Committee on Armed Services on H. R. 2498, 81st Cong., 1st Sess. 881.

to deprive people of trials under Bill of Rights safeguards, and we are not willing to hold that power to circumvent those safeguards should be inferred through the Necessary and Proper Clause. It is impossible to think that the discipline of the Army is going to be disrupted, its morale impaired, or its orderly processes disturbed, by giving ex-servicemen the benefit of a civilian court trial when they are actually civilians. And we are not impressed by the fact that some other countries which do not have our Bill of Rights indulge in the practice of subjecting civilians who were once soldiers to trials by courts-martial instead of trials by civilian courts.[20]

There are dangers lurking in military trials which were sought to be avoided by the Bill of Rights and Article III of our Constitution. Free countries of the world have tried to restrict military tribunals to the narrowest jurisdiction deemed absolutely essential to maintaining discipline among troops in active service. Even as late as the Seventeenth Century standing armies and courts-martial were not established institutions in England.[21] Court-martial jurisdiction sprang from the belief that within the military ranks there is need for a prompt, ready-at-hand means of compelling obedience and order. But Army discipline will not be improved by court-martialing rather than trying by jury some civilian ex-soldier who has been wholly separated from the service for months, years or perhaps decades. Consequently considerations of discipline provide no excuse for new expansion of court-martial jurisdiction at the expense of the nor-

---

[20] The historical background of this country's preference for civilian over military trials was impressively presented in the arguments of counsel and opinion of this Court in *Ex parte Milligan*, 4 Wall. 2, 121. And see *Duncan* v. *Kahanamoku*, 327 U. S. 304.

[21] 3 Macaulay, History of England from the Accession of James the Second (London, 1855), 45.

mal and constitutionally preferable system of trial by jury.[22]

Determining the scope of the constitutional power of Congress to authorize trial by court-martial presents another instance calling for limitation to *"the least possible power adequate to the end proposed."* [23] We hold that Congress cannot subject civilians like Toth to trial by court-martial. They, like other civilians, are entitled to have the benefit of safeguards afforded those tried in the regular courts authorized by Article III of the Constitution.

*Reversed.*

MR. JUSTICE REED, with whom MR. JUSTICE BURTON and MR. JUSTICE MINTON join, dissenting.

This case presents the question whether or not an honorably discharged ex-serviceman may be apprehended by military authorities to stand trial by court-martial for a crime alleged to have been committed by him while he was a member of the armed forces of the United States. The answer turns upon the constitutionality and construction of the applicable provisions of the Uniform Code of Mili-

---

[22] Mr. Justice Sutherland writing for the Court in *Dimick* v. *Schiedt*, 293 U. S. 474, 485–486, said, "The right of trial by jury is of ancient origin, characterized by Blackstone as 'the glory of the English law' and 'the most transcendent privilege which any subject can enjoy' (Bk. 3, p. 379); and, as Justice Story said (2 Story on the Constitution, § 1779), '. . . the Constitution would have been justly obnoxious to the most conclusive objection if it had not recognized and confirmed it in the most solemn terms.' With, perhaps, some exceptions, trial by jury has always been, and still is, generally regarded as the normal and preferable mode of disposing of issues of fact in civil cases at law as well as in criminal cases. Maintenance of the jury as a fact-finding body is of such importance and occupies so firm a place in our history and jurisprudence that any seeming curtailment of the right to a jury trial should be scrutinized with the utmost care. Compare *Patton* v. *United States*, 281 U. S. 276, 312."

[23] *Anderson* v. *Dunn*, 6 Wheat. 204, 230–231.

tary Justice, 64 Stat. 108, 50 U. S. C. § 551 *et seq.,* under which the United States Air Force acted in this case.

Whenever an enactment of Congress to cure weaknesses in criminal procedure is declared unconstitutional by this Court on the ground of lack of legislative power, the door is closed for all practical purposes forever on the method that Congress deems effective for correcting crime. Only an overruling of this case can change today's constitutional determination.

The judgment just announced turns loose, without trial or possibility of trial, a man accused of murder. In future similar cases among the military, if Congress enacts the substitute law as the Court suggests, *ante,* p. 21, the accused must face a jury far removed from the scene of the alleged crime and before jurors without the understanding of the quality and character of a military crime possessed by those accustomed to administer the Uniform Code of Military Justice. Or perhaps those accused will be extradited and tried by foreign law.

A dissent is justified, I think, if its argument may limit, in some degree, further interpreting limitations by the judiciary on the power granted by the Constitution to Congress: "To make Rules for the Government and Regulation of the land and naval Forces" without the jury and venue requirements of the Fifth and Sixth Amendments. These requirements are appropriate for civil trials but, by custom, our precedents and express language are inapplicable to "cases arising in the land or naval forces."

Robert W. Toth, after service in the United States Air Force, was honorably discharged on December 8, 1952. On April 8, 1953, formal charges were signed under the procedures required by the Uniform Code of Military Justice charging Toth with premeditated murder and conspiracy to commit murder.[1] The specifications under the

---

[1] The charges were violations of Articles 118 and 81 respectively of the Uniform Code of Military Justice, 50 U. S. C. §§ 712, 675.

charges alleged that the offenses were committed by Toth while an Airman First Class, United States Air Force, on September 27, 1952, at an air base in Korea, and the victim was a named Korean national. It was further alleged that Toth was a civilian subject to the Uniform Code of Military Justice under Article 3 (a) thereof which provides:

> "Subject to the provisions of article 43, any person charged with having committed, while in a status in which he was subject to this code, an offense against this code, punishable by confinement of five years or more and for which the person cannot be tried in the courts of the United States or any State or Territory thereof or of the District of Columbia, shall not be relieved from amenability to trial by courts-martial by reason of the termination of said status." 64 Stat. 109, 50 U. S. C. § 553 (a).[2]

On May 13, 1953, pursuant to orders originally issued by the Acting Secretary of the Air Force on April 30, 1953, and further supplemental orders through appropriate Air Force command channels, Toth was apprehended by Air Force police at his place of employment in Pittsburgh, Pennsylvania. On May 15, 1953, he was flown to Korea where he arrived on May 18, 1953.

This was the situation when the petition for habeas corpus was filed by the relator. The Government did not question jurisdiction in the District Court and after argument that court ordered the writ to issue.[3] Toth was returned to the United States and produced in court, whereupon the District Court ordered his discharge on the ground that even if the Air Force police had authority to apprehend Toth, they had no legal power to transport him to a distant point for trial or at least to do so without

---

[2] Article 43 is the statute of limitations applicable to offenses punishable under the Code, 50 U. S. C. § 618.

[3] 113 F. Supp. 330.

a hearing. The court therefore found it unnecessary to pass on the constitutional objections raised by the petitioner as to the invalidity of Article 3 (a). 114 F. Supp. 468.

On appeal, the Court of Appeals for the District of Columbia Circuit reversed the District Court, discharged the writ and ordered Toth returned to the military authorities. 94 U. S. App. D. C. 28, 215 F. 2d 22. The Court of Appeals held that Article 3 (a) of the Code was constitutionally valid and that the Code provided the necessary authorization and machinery to apprehend and transport for trial, in the manner here followed, persons in civilian status who were amenable to courts-martial by reason of the provisions of Article 3 (a).

The Code was enacted May 5, 1950, after careful military and congressional study to assure that the military justice of the unified services would be in accordance with the present-day standards of fairness.[4] Article 3 (a) was adopted in view of the decision of this Court in *Hirshberg* v. *Cooke*, 336 U. S. 210 (1949), holding the Articles for the Government of the Navy, then in force, did not allow trial on charges filed subsequent to honorable discharge "without a grant of congressional authority," *id.*, at 215, although the charges arose from acts committed while the defendant was in military service. The near escape from military justice of Army personnel accused of the theft in Germany of the Hesse crown jewels was also in mind.[5] It was thought that a serviceman's discharge should not bar his prosecution in a military court for crimes committed when subject to military discipline.[6]

[4] S. Rep. No. 486, 81st Cong., 1st Sess., p. 3; H. R. Rep. No. 491, 81st Cong., 1st Sess., p. 2.

[5] Hearings before a Subcommittee of the House Committee on Armed Services on H. R. 2498, 81st Cong., 1st Sess., pp. 879–885. See *Durant* v. *Hiatt*, 81 F. Supp. 948.

[6] Both the House and Senate Committee Reports stated that the need for Article 3 (a) was to remedy the undesirable situation pointed

The enactment of Article 3 (a) was chosen instead of the alternative of federal district court jurisdiction, although thorough presentations of objections not only on constitutional but also on policy grounds appear in the committee report and the Congressional Record.[7]  The military were well aware, as was Congress, of possible unfavorable public reaction to extension of the jurisdiction of military courts to discharged veterans for alleged misdeeds during service.  The language of Article 3 (a) was drawn to cover only the most serious offenses and restricted to those instances in which the guilty would otherwise escape trial or punishment in any American courts.  Although Congress, under Art. I, § 8, cl. 14,[8] and the Necessary and Proper Clause, doubtless might have authorized the civil courts to try charges arising from violations of the Military Code during former service, even

out by the *Hirshberg* decision.  Both reports contain the following sentence: "In the opinion of the committee, the present provisions [Article 3 (a)] of this subdivision provide a desirable degree of continuing jurisdiction and at the same time place sufficient limitations on the continuing jurisdiction to prevent capricious actions on the part of military authorities."  H. R. Rep. No. 491, 81st Cong., 1st Sess. 11; S. Rep. No. 486, 81st Cong., 1st Sess. 8.  The same view was expressed by the managers of the bill in the House and Senate. Representative Brooks at 95 Cong. Rec. 5721 and Senator Kefauver at 96 Cong. Rec. 1358.  Views against the adoption of Article 3 (a) were urged in committee and on the floor but did not prevail.  Hearings before a Subcommittee of the Senate Committee on Armed Services on S. 857 and H. R. 4080, 81st Cong., 1st Sess. 256–257; 96 Cong. Rec. 1294, 1366, 1412–1417.

[7] 96 Cong. Rec. 1294 *et seq.*  The proposed substitute for Article 3 (a) was: "Subject to the provisions of article 43, jurisdiction is hereby conferred upon the several district courts of the United States to try and punish according to the applicable provisions and limitations of this code and the regulations made thereunder—

"(1) any person charged with having committed an offense against this code while in a status in which he was subject to this code which status has been terminated; . . . ."

[8] "To make Rules for the Government and Regulation of the land and naval Forces; . . . ."

though committed on foreign soil,[9] it chose the method of Article 3 (a).

No question of accommodating the liberty of the citizen *to requirements of the military through the interpretation of an ambiguous Act arises.* Compare *Ex parte Endo,* 323 U. S. 283, 300. It is not for courts to question the wisdom of the legislation. Its obvious purpose was to assure, insofar as discipline may do so, the proper conduct of our far-flung and numerous military personnel in foreign lands. One need not stress the necessity of orderly conduct by the military on foreign posts for the maintenance of good relations in friendly or vanquished countries. It also seems a reasonable choice that uniform treatment by courts-martial trial of all accused of crimes punishable by the Military Code is preferred for morale and disciplinary purposes to courts-martial trial only for those who remain in the service. This case itself would make a good example of the difficulty of a federal district court trial. We address ourselves to the constitutionality of Article 3 (a).

(a) The congressional power under Article I of the Constitution to regulate the armed forces is conceded by the Court to embrace the power to provide for trial by court-martial and military punishment for violations of the Military Code. But the Court holds that that power ceases when the serviceman becomes a civilian. Nothing, we think, in the words of Article I or in the history of that congressional power justifies limiting trial and

---

[9] "The Trial of all Crimes, except in Cases of Impeachment, shall be by Jury; and such Trial shall be held in the State where the said Crimes shall have been committed; but when not committed within any State, the Trial shall be at such Place or Places as the Congress may by Law have directed." Art. III, § 2, cl. 3.

*Skiriotes* v. *Florida,* 313 U. S. 69, 73, and cases cited; *Chandler* v. *United States,* 171 F. 2d 921.

punishment by the military, for crimes committed by members of the armed services, to the period of service. Certainly the power of Congress to provide for a military trial and punishment for a breach of the Military Code on charges brought before the end of enlistment or discharge may continue thereafter.[10] The crime charged against Toth was one covered by the Code. The circumstance that he was discharged from the service prior to the detection of the alleged crime and prior to being charged with its commission should make no constitutional difference.

Courts-martial are deeply rooted in history. War is a grim business, requiring sacrifice of ease, opportunity, freedom from restraint, and liberty of action. Experience has demonstrated that the law of the military must be capable of prompt punishment to maintain discipline. The power to regulate the armed forces must have been granted to Congress so that it would have the authority over its armed forces that other nations have long exercised, subject only to limitations of the Constitution. *Dynes* v. *Hoover,* 20 How. 65, 78–79; *Ex parte Reed,* 100 U. S. 13, 21. The Government calls our attention to the current provisions for military trial after discharge of other nations with legal background similar to ours. Each of them allows such trials under varying conditions.[11]

---

[10] *Carter* v. *McClaughry,* 183 U. S. 365, 382; *Mosher* v. *Hunter,* 143 F. 2d 745. Cf. *Kahn* v. *Anderson,* 255 U. S. 1, 7; *Walker* v. *Morris,* 3 American Jurist and Law Magazine 281.

[11] Section 158 of the British Army Act (Gt. Brit., Stats. Rev., 3d ed., Vol. X, 457, 563–564; War Office, Manual of Military Law, Pt. I, 1951, 376–377) provides:

"(1) Where an offence under this Act has been committed by any person while subject to military law, such person may be taken into and kept in military custody, and tried and punished for such offence, although he, or the corps or battalion to which he belongs, has ceased to be subject to military law in like manner as he might have been

Whether English courts-martial before 1789 exercised jurisdiction over charges preferred after separation from service cannot be categorically asserted in view of the paucity of cases. It would seem, however, that the language of Article I itself properly should be interpreted

taken into and kept in military custody, tried or punished, if he or such corps or battalion had continued so subject:

"Provided that where a person has since the commission of an offence ceased to be subject to military law, he shall not be tried for such offence, except in the case of the offence of mutiny, desertion, or fraudulent enlistment, unless his trial commences within three months after he had ceased to be subject to military law, or unless the offence was committed outside the United Kingdom and is an offence which when committed in England is punishable by the law of England, and the Attorney-General consents to the trial . . . ."

The British Army Act, including the provision in § 158 for court-martial after termination of military service, dates from 1881. 17 Law Reports (Statutes) 44 and 45 Vict. 260, 331.

See also the Defence Act of Australia, § 103 (3), Commonwealth Acts, Vol. II (1901–1950), 1560, 1596; National Defence Act of Canada, 1950, §§ 56 (2) and (3), and 68 (f), Revised Statutes of Canada, 1952, Vol. III, 3814 and 3821. New Zealand has a similar statute (Army Act, § 127 (1), New Zealand Statutes, 1950, 283, 370–371).

At the time of our Constitutional Convention, there had already been held the well-known court-martial of Lord George Sackville for disobedience of orders of his Chief, Prince Ferdinand of Brunswick, at the battle of Minden. The trial took place after his dismissal from his command and the service. The King, George II, submitted the question of jurisdiction of the court-martial to the twelve judges composing the Courts of King's Bench, Common Pleas and Exchequer, headed by Lord Mansfield, and received the following advisory answer:

"In obedience to your Majesty's commands, signified to us by a letter . . . , referring to us the following question, 'Whether an officer of the army having been dismissed from his Majesty's service, and having no military employment, is triable by a Court Martial for a military offence lately committed by him while in actual service and pay as an officer?'

"We have taken the same into consideration, and see no ground

to empower Congress to authorize courts-martial after separation from the services. The crime charged was committed during service and violated the Military Code. Surely when read with the Necessary and Proper Clause, the conclusion must follow. Article 3 (a) bears a reasonable relation to the "Government and Regulation" of the armed forces; it is appropriate and plainly adapted to that end. *McCulloch* v. *Maryland,* 4 Wheat. 316, 419 *et seq.* That has been the test of congressional power.

This is not an effort to make a civilian subject to military law, in distinction to martial law, as in *Ex parte Milligan,* 4 Wall. 2, 121, 123, 127. Such an effort would meet condemnation as an invasion of the liberty of the citizen. See *Duncan* v. *Kahanamoku,* 327 U. S. 304; *Ex parte Endo,* 323 U. S. 283. Congress was granted authority to regulate the armed forces in order to enforce obedience by members of the military establishment to military regulation during their service to the end that order may be ensured. Disobedience may occur in nationally critical times. What reason can there be for

---

to doubt of the legality of the jurisdiction of a Court Martial in the case put by the above question."

The judges ended with a reservation of the privilege of changing their minds if the matter were judicially presented, apparently in accordance with the practice in such advisory opinions. See note, 28 Eng. Rep. 941. II Eden's Chancery Reports, App., p. 371. See Trials, Courts Martial—Sackville, 1760. On conviction the King directed the sentence be recorded in the order book of every regiment, British and American. In view of the prominence of the parties and the subsequent distinguished career of Lord George Sackville, who died in 1785 after having been advanced in 1782 to the peerage as Viscount Sackville for his services in Parliament, the Irish administration, and as Secretary of State for the Colonies, the case could hardly have escaped the notice of the members of the Constitutional Convention. See VII Dictionary of Nat. Biography 1110; 4 Smollett, History of England, 337; Tytler, Military Law (2d ed.), 113. 8 Op. Atty. Gen. 328. But see, 31 Op. Atty. Gen. 521; Clode, Martial and Military Law, 92.

refusing courts-martial jurisdiction over crimes so committed by a serviceman merely because they passed undiscovered during the service period?[12] Could there now be doubt as to the power of Congress under Art. I to make a draftee subject to courts-martial before actual induction into the armed forces? This Court had none in 1944. Then we said, when considering a habeas corpus for release from military imprisonment after trial by court-martial of a person claiming civilian status:

> "We have no doubt of the power of Congress to enlist the manpower of the nation for prosecution of the war and to subject to military jurisdiction those who are unwilling, as well as those who are eager, to come to the defense of their nation in its hour of peril. *Arver* v. *United States,* 245 U. S. 366 [Selective Draft Law Cases]." *Billings* v. *Truesdell,* 321 U. S. 542, 556.

Toth may be a civilian but his crime was a violation of military regulations.

Judicial history lends its weight to the conclusion that congressional power to institute criminal proceedings against a military person continues after the accused's discharge. In 1863, the Congress enacted an Act to prevent and punish frauds upon the Government of the United States. It provided that any person in the mili-

---

[12] It must be noted, however, that a leading military authority is against that view. See Winthrop, Military Law and Precedents (2d ed., Reprint 1920), 105, although he admits the weight of the precedents is against him.

See, however, a comparable authority, Edmund M. Morgan, Court-Martial Jurisdiction, 4 Minn. Law Rev. 79, 83 (1920). For further discussion of the problem, see Myers and Kaplan, Crime Without Punishment, 35 Geo. L. J. 303 (1947); Note, Military Jurisdiction over Discharged Servicemen: Constitutionality and Judicial Protection, 67 Harv. L. Rev. 479 (1954); Note, The Amenability of the Veteran to Military Law, 46 Col. L. Rev. 977 (1946).

tary forces shall be punished for fraud under military regulation "as the court-martial may adjudge, save the punishment of death." 12 Stat. 696–697, § 1. Under § 2, jurisdiction of the court-martial was extended to dischargees.[13] The provision for charge and court-martial after discharge was ruled constitutional in 1866 by Attorney General Stanbery.[14] The section was held constitutional in 1873. *In re Bogart,* 3 Fed. Cas. 796. See other cases, note 22, *infra.* It was apparently held unconstitutional in 1946 under Article I in the District Court for the Southern District of New York, although the problem under the Fifth Amendment was also considered. *United States ex rel. Flannery* v. *Commanding General,* 69 F. Supp. 661, 664.[15]

---

[13] "That any person heretofore called or hereafter to be called into or employed in such forces or service, who shall commit any violation of this act and shall afterwards receive his discharge, or be dismissed from the service, shall, notwithstanding such discharge or dismissal, continue to be liable to be arrested and held for trial and sentence by a court-martial, in the same manner and to the same extent as if he had not received such discharge or been dismissed."

This was carried into the Articles of War. Rev. Stat. (1878), Art. 60, p. 235; 10 U. S. C. (1946 ed.) § 1566, Art. 94, amended 62 Stat. 641, and in the Articles for the Government of the Navy, 34 U. S. C. (1946 ed.) § 1200, Art. 14 (Eleventh), until the enactment of the present Uniform Code, Art. 3.

[14] 12 Op. Atty. Gen. 4, 5: "It is simply a regulation which is to follow a dismissal, providing, in certain contingencies, for the restoration of the officer to the service, and leaving the dismissal in full force if those contingencies do not happen."

In 1848 Attorney General Toucey, in the absence of any applicable rule for the government of the Army, had ruled that a charge of murder could not be brought against an officer already mustered out. 5 Op. Atty. Gen. 55, 58. A similar conclusion was stated by Attorney General Palmer (1919), 31 Op. Atty. Gen. 521, 529. See 8 Op. Atty. Gen. 328, 332.

[15] We are advised by the Government that this case was reversed by stipulation. See *Kronberg* v. *Hale,* 180 F. 2d 128, 130.

It is also to be noted that the present Uniform Code, Art. 4, 50 U. S. C. § 554, provides that an officer dismissed by the President may request trial by court-martial after such dismissal. A similar provision was first enacted by Congress in 1865, § 12, 13 Stat. 487, 489; see Winthrop, Military Law and Precedents (2d ed., Reprint 1920), 64, 65.

The Court finds a "compelling reason" for construing the clause for Army regulation more narrowly than has been done by the Congress and the Executive for many years. This is that trial by Article III judges and juries offers safeguards to military offenders superior to those offered by courts-martial. Under our judicial system the use of juries has been found satisfactory in civil life. The argument for the adoption of civil trials for the military might appeal to Congress, if presented there. But, with due respect to the premise of the majority, the assumed superiority of the civil courts in the trial of service crimes should have no force in the construction of the constitutional power of Congress to enact Article 3 (a) of the Code. Belief that an accused has better opportunities to escape conviction in a civil court should not influence a conclusion as to constitutional power. As later appears in this opinion, the Fifth and Sixth Amendments except the land and naval forces from their commands. The advantages and disadvantages of indictment, venue and jury trial for the military have been weighed and determined adversely to the Court's conclusion by the Constitution and the Congress. Certainly the number of former members of the armed services now living is immaterial to the constitutional issue, as are the "dangers" suggested to be "lurking in military trials." The military is in position to give its personnel a fair trial. The only logical ground for declaring Article 3 (a) unconstitutional is that military crimes cannot be so punished because such procedure is beyond the reach of the con-

gressional authority to make rules for government of military personnel.   Subsequent punishment by military procedures will help discipline during service.   Such a conclusion by Congress is not strained or unreasonable but a natural use of its power to make regulations for the armed services.   The choice is for Congress, not the Court.

(b) Another constitutional problem arises, *i.· e.*, that Article 3 (a) is unlawful by reason of the limitations on prosecutions of the Fifth and Sixth Amendments to the Constitution.[16]

The argument upon the Sixth Amendment requires only summary treatment.   The rights to a speedy and public trial, impartiality of the triers, information as to the charge, confrontation, compulsory process for witnesses and assistance of counsel are not in issue.   This accused will not have for his trial a jury of the State and district of the crime, previously ascertained by our law. That is an impossibility in the circumstances of this case. Nor can it be that the Sixth Amendment requirements as

---

[16] Fifth Amendment: "No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

Sixth Amendment: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

to jury and place were intended to apply to the "cases arising in the land or naval forces" which were excepted from the protection of the grand jury by the Fifth.  That would abrogate the authority of Congress to govern the military by courts-martial.  It was so announced by this Court, unanimously, in *Ex parte Milligan,* 4 Wall. 2, 122.[17]

---

[17] "Another guarantee of freedom was broken when Milligan was denied a trial by jury.  The great minds of the country have differed on the correct interpretation to be given to various provisions of the Federal Constitution; and judicial decision has been often invoked to settle their true meaning; but until recently no one ever doubted that the right of trial by jury was fortified in the organic law against the power of attack.  It is *now* assailed; but if ideas can be expressed in words, and language has any meaning, *this right*—one of the most valuable in a free country—is preserved to every one accused of crime who is not attached to the army, or navy, or militia in actual service. The sixth amendment affirms that 'in all criminal prosecutions the accused shall enjoy the right to a speedy and public trial by an impartial jury,' language broad enough to embrace all persons and cases; but the fifth, recognizing the necessity of an indictment, or presentment, before any one can be held to answer for high crimes, *'excepts* cases arising in the land or naval forces, or in the militia, when in actual service, in time of war or public danger;' and the framers of the Constitution, doubtless, meant to limit the right of trial by jury, in the sixth amendment, to those persons who were subject to indictment or presentment in the fifth."

The four who concurred agreed with the majority on this point:

"The Constitution itself provides for military government as well as for civil government.  And we do not understand it to be claimed that the civil safeguards of the Constitution have application in cases within the proper sphere of the former.

"What, then, is that proper sphere?  Congress has power to raise and support armies; to provide and maintain a navy; to make rules for the government and regulation of the land and naval forces; and to provide for governing such part of the militia as may be in the service of the United States.

"It is not denied that the power to make rules for the government of the army and navy is a power to provide for trial and punishment by military courts without a jury.  It has been so understood and exercised from the adoption of the Constitution to the present time.

"Nor, in our judgment, does the fifth, or any other amendment,

Defendants in cases arising in the armed forces, we think, are not entitled to demand trial by jury, whether the crime was committed on foreign soil or at a place within a State or previously ascertained district.

Turning to the Fifth Amendment, the critical words are obviously "cases arising in the land or naval forces." The events leading to the taking of Toth into custody occurred while he was enlisted. They constituted then and now a violation of the Uniform Code. Relator would limit the quoted words to cases where charges had been filed during service. She stresses the phrase "when in actual service," but this Court has held and all the history of our courts-martial shows that such phrase has reference only to "cases arising . . . in the Militia." *Johnson* v. *Sayre,* 158 U. S. 109, 114.

The Fifth, like the other early amendments, arose from the determination to protect the rights of citizens. As the Articles of Confederation, Article 9, granted authority to the central government to make rules for the government and regulation of the armed forces, the Nation was

abridge that power. 'Cases arising in the land and naval forces, or in the militia in actual service in time of war or public danger,' are expressly excepted from the fifth amendment, 'that no person shall be held to answer for a capital or otherwise infamous crime, unless on a presentment or indictment of a grand jury,' and it is admitted that the exception applies to the other amendments as well as to the fifth.

.            .            .            .            .

"We think, therefore, that the power of Congress, in the government of the land and naval forces and of the militia, is not at all affected by the fifth or any other amendment." 4 Wall., at 137–138.

It was so held as to Haupt, treated as an American citizen in *Ex parte Quirin,* 317 U. S. 1, 20, 24, 40, 44.

"We conclude that the Fifth and Sixth Amendments did not restrict whatever authority was conferred by the Constitution to try offenses against the law of war by military commission, and that petitioners, charged with such an offense not required to be tried by jury at common law, were lawfully placed on trial by the Commission without a jury." *Id.*, at 45.

conversant with the problem. In the state conventions for ratification of the Constitution, Massachusetts, New Hampshire, New York and Rhode Island suggested words for regulation of the armed forces quite similar to the ones adopted by Congress.[18]  It will be observed that two employ "arise." Three speak of "cases." Since the state suggestions were made as the result of consideration of the proposed Constitution, it is quite natural that the language of Article III concerning the judicial power would find an echo in the suggestions. Article III, § 2, reads, "The judicial Power shall extend to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority . . . ." When the Congress considered the Act against military fraud in 1863, note 13, *supra,* no one suggested that a "case," the prosecution for which under the Act did not

---

[18] Massachusetts: "That no person shall be tried for any crime by which he may incur an infamous punishment, or loss of life, until he be first indicted by a grand jury, except in such cases as may arise in the government and regulation of the land and naval forces."

New Hampshire: "That no person shall be tried for any crime by which he may incur an infamous punishment, or loss of life, until he first be indicted by a grand jury, except in such cases as may arise in the government and regulation of the land and naval forces."

New York: "That (except in the government of the land and naval forces, and of the militia when in actual service, and in cases of impeachment) a presentment or indictment by a grand jury ought to be observed as a necessary preliminary to the trial of all crimes cognizable by the judiciary of the United States; . . . ."

Rhode Island: "That, in all capital and criminal prosecutions, a man hath the right to demand the cause and nature of his accusation, to be confronted with the accusers and witnesses, to call for evidence, and be allowed counsel in his favor, and to a fair and speedy trial by an impartial jury in his vicinage, without whose unanimous consent he cannot be found guilty, (except in the government of the land and naval forces,) nor can he be compelled to give evidence against himself."  I Elliot's Debates (2d ed.), 323, 326, 328, 334.

begin until after discharge of a serviceman, would not be a "case arising in the land or naval forces." The concern of Congress was with the liability of contractors, as part of military personnel, under § 1 of the Act, when they had no true military service status.[19] Because not service-connected, the contractors' clause has been held unconstitutional. *Ex parte Henderson,* 11 Fed. Cas. 1067, 1071.

The word "case," of course, might refer to litigation— a charge or complaint brought in court, here a prosecution. But it seems to us that its meaning, as used in the constitutional clauses under consideration, is a state of facts for judicial action, *i. e.,* the series of events that creates an enforceable right or obligation. The context in which it is used bears on the final definition. Here "cases arising" is more specific than the word "case" alone. The Government gives us several citations to cases applying the meaning for which it contends.[20]

---

[19] As to that, Senator Howard, in charge of the bill, said:

"The question arises, what is a 'case arising in the land or naval forces of the United States?' There is not any doubt that a soldier or officer who has enlisted in the service of the United States is or may be made subject to martial law. Why is he made subject to martial law? Because, being in the service of the United States, the act committed by him is a case arising in that service. . . . An officer or soldier enters the Army under contract, under an agreement to render this service; and how, I beg to inquire, does the case of a contractor who engages to furnish arms, equipments, or munitions of war to the United States for the same purpose, differ from the case of an officer or soldier who is simply to bear arms and use the materials which the contractor is to furnish?" Cong. Globe, 37th Cong., 3d Sess. 953 (1863).

[20] *United States* v. *Bevans,* 3 Wheat. 336, 388, "the waters on which . . . cases may arise"; *Waring* v. *Clarke,* 5 How. 441, 466, "case of collision taking place on the Mississippi river"; and "cause of action arisen on the ocean." *Id.,* at 467. *De Lovio* v. *Boit,* 7 Fed. Cas. 418, 432, 434–435.

Relator does the same.[21] Article III uses "cases arising" under federal law to indicate the extent of possible federal jurisdiction over legal rights or duties created by the laws of the United States. The meaning of "cases arising" in Article III and the Fifth Amendment must be determined by their purpose. That purpose is similar—to mark the source of the cause of action that ripens into a civil complaint or criminal charge. However restricted the word "case" may be, its use with "arising" points to the source of the litigation. If a case is claimed to exist only after institution of legal proceedings, nevertheless that case has its roots, it arises, in the events that give life to the cause of action. When a case so arises was stated thus in *Gully* v. *First Nat. Bank,* 299 U. S. 109, 112, in an opinion concerning the removal statute, where

---

[21] "This clause enables the judicial department to receive jurisdiction to the full extent of the constitution, laws, and treaties of the United States, when any question respecting them shall assume such a form that the judicial power is capable of acting on it. That power is capable of acting only when the subject is submitted to it by a party who asserts his rights in the form prescribed by law. It then becomes a case, and the constitution declares, that the judicial power shall extend to all cases arising under the constitution, laws, and treaties of the United States." *Osborn* v. *Bank of The United States,* 9 Wheat. 738, at 819.

"By cases and controversies are intended the claims of litigants brought before the courts for determination by such regular proceedings as are established by law or custom for the protection or enforcement of rights, or the prevention, redress, or punishment of wrongs. Whenever the claim of a party under the Constitution, laws, or treaties of the United States takes such a form that the judicial power is capable of acting upon it, then it has become a case. The term implies the existence of present or possible adverse parties whose contentions are submitted to the court for adjudication." *In re Pacific R. Commission,* 32 F. 241, 255.

"These definitions have been adhered to by this Court in *Muskrat* v. *United States,* 219 U. S. 346, 356 and *Aetna Life Insurance Company* v. *Haworth,* 300 U. S. 227."

removal was asked because the state suit was alleged to have arisen under federal law:

"To bring a case within the statute, a right or immunity created by the Constitution or laws of the United States must be an element, and an essential one, of the plaintiff's cause of action. . . . The right or immunity must be such that it will be supported if the Constitution or laws of the United States are given one construction or effect, and defeated if they receive another. . . ."

One of the purposes of the Fifth Amendment by this exception was to preserve the separation of military law from the requirements of civil law. The regulation of the armed forces by Congress under cl. 14 of § 8, Art. I, was to be left for legislative judgment that discipline might be maintained by speedy trial and punishment in accordance with military law. The reasons, set out in our discussion of Article I power to regulate the armed forces, need not be repeated here. We ask ourselves, "What law is the basis of this prosecution?" The answer is the Military Code. If so, the case arises "in the land or naval forces."

That conclusion has the support of the weight of the precedents dealing with this phase of the Fifth Amendment. To meet the argument of defendant that jurisdiction must attach before discharge, it was said in the *Bogart* case, 3 Fed. Cas. 796, 799:

"Among the ordinary and most common definitions of the word 'arise,' are 'to proceed, to issue, to spring,' and a case arising in the land or naval forces upon a fair and reasonable construction of the whole article, appears to us to be a case proceeding, issuing or springing from acts in violation of the naval laws and regulations committed while in the naval forces or service."

This statement has been strengthened by the accord given the argument by other courts.[22]

(c) The Court, of course, does not gainsay the constitutional authority of Congress to adopt a military code for regulation of members of the armed forces without regard to the generally applicable requirements of the Fifth and Sixth Amendments. It holds that where the constitutional safeguards of the Fifth and Sixth Amendments for a citizen's freedom from tyranny are at stake, they should not be withdrawn except through absolute necessity. There is no such necessity here for it would have been possible to have provided a proper civil trial with the full protection of the applicable clauses of the Amendments. But here we are considering an exception to the safeguards offered by the Fifth and Sixth Amendments. That exception has been written into the Constitution from the experience of history to protect the discipline of the armed forces. Of course, that exception from the protections of these Amendments should be strictly construed to hold those excluded to the minimum as was done in *Ex parte Henderson, supra,* p. 39. Construction of the Constitution, however, should not be allowed to emasculate the natural meaning of language designed to protect the Nation in the regulation of its armed forces.

What we have argued in the foregoing pages of this opinion supports our conclusion on this tendered rule of construction. Granting that there are possible means of affording civil trials to persons discharged from the Army for military crimes committed during their service, we think that Congress has power to provide for punishment of these military crimes under the constitutional exceptions discussed. Such punishment, if our analysis of

---

[22] *Ex parte Joly,* 290 F. 858; *Terry* v. *United States,* 2 F. Supp. 962; *Kronberg* v. *Hale,* 180 F. 2d 128.

Article I and the Fifth and Sixth Amendments is correct, will be for military crimes of servicemen, not of civilians, and for the maintenance of discipline in the armed forces.

The relator phrases strongly her argument against Toth's prosecution by courts-martial. To her the issue is "military dictatorship." Though she concedes that Congress may have merely desired to bar absolution from crime by discharge from service, such purpose, she argues, should not override the Constitution or be allowed to foreshadow a "military dictatorship." She forebodes that every petty crime may be included and limitation of prosecution be extended until all discharged servicemen shall live their lives under fear of the Military. The law still has degrees of harshness and courts and legislatures must act in reason. The possibility of individual abuse of power is ever present even under our Constitution but the probability of obliteration of any such tendency through judicial, executive or legislative action is the citizen's protection under the Constitution. A fear that punishment by courts-martial of servicemen after discharge may bear a threat to the rights and security of citizens is extravagant. It is true today, as it was in the time of the Founding Fathers, that the methods for maintenance of Army discipline should be subject to public opinion as expressed through Congress. If trial of discharged servicemen by courts-martial under the carefully defined provisions of Article 3 (a) seems harsh or hurtful to liberty, the door of Congress remains open for amelioration. This decision that a veteran, let out of the military forces before charges, must, by the Constitution, be tried by the civil courts for his military crimes impairs congressional power. Now only another Constitutional Amendment or a reversal of today's judgment will enable Congress to deal consistently with those violating the Uniform Code of Military Justice. We cannot agree that those who adopted the constitutional provisions for the

protection of military discipline intended such a result. Toth's alleged accomplices have been convicted by military courts and we see no reason why he should not be tried as proposed.

The decision below should be affirmed.

MR. JUSTICE MINTON, whom MR. JUSTICE BURTON joins, dissenting.

I agree with the opinion of MR. JUSTICE REED, and I would add another reason why I think the judgment should be affirmed.

A civilian not under the jurisdiction of the Military Code has a right to be tried in a civil court for an alleged crime as a civilian. My trouble is that I don't think Toth was a full-fledged civilian. By 50 U. S. C. § 553, Congress had retained jurisdiction to try Toth for a crime he had committed while a soldier and for which admittedly he could have been tried by court-martial if the United States had discovered his crime one minute before discharge.

He was not a full-fledged civilian under his discharge. He was still a soldier to answer in court-martial for the crime he had committed while a soldier. He had a conditional discharge only. The United States clearly reserved the right to charge and try him by court-martial for a crime committed while in the status of a soldier. This is the way Congress had provided for his trial. No other way was provided. That it may have provided another way is not to say the way provided is invalid.

I know of no reason why Congress could not pass this statute, 50 U. S. C. § 553, retaining court-martial jurisdiction over Toth to answer for a crime he allegedly committed when he was clearly subject to court-martial. *Kahn* v. *Anderson,* 255 U. S. 1, holds that, even though discharged from service, one convicted and serving sentence for a military offense could still be tried by court-

martial for murder and conspiracy to commit murder, even though the crime was alleged to have been committed within the limits of a state. Congress had made no provision for retention of status in that case as it had in this case, yet the Court implied the continuing military status to warrant the jurisdiction. No implied status is necessary here. It is expressly reserved by statute. Toth remained in that status by virtue of the statute.